Opinion filed February 28, 2008











 
 
  
 
 







 
 
  
 
 




Opinion filed February 28,
2008

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                   __________

 

                                                          No. 11-06-00045-CV 

                                                    __________

 

                                         ALBERT PEEK, Appellant

 

                                                             V.

 

                   TOBY
RUDIK AND TIFFANY SIMS, INDIVIDUALLY 

                     AND
AS REPRESENTATIVES OF THE ESTATE OF 

                                 JANET
PEEK, DECEASED, Appellees

 



 

                                         On
Appeal from the 266th District Court

 

                                                           Erath
County, Texas

 

                                                Trial
Court Cause No. CV 25148

 



 

                                             M E M O R A
N D U M  O P I N I O N         

 








Toby
Rudik and Tiffany Sims filed a wrongful death action against Albert Peek
following the death of Albert=s
wife, Janet Peek.  The jury found that Albert intentionally and knowingly
caused the death of Janet Peek.  Based upon the jury=s verdict, the trial court entered judgment in
favor of Toby and Tiffany and found that Toby and Tiffany were entitled to the
proceeds of the life insurance policies on Janet.  The trial court further
ordered that Tiffany and Toby each recover $5,000,000 from Albert. Albert
appeals from the trial court=s
judgment.  We affirm.








In
his third and fourth issues on appeal, Albert argues that the evidence is
legally and factually insufficient to support the jury=s verdict.  In his fifth issue on appeal,
Albert contends that the trial court erred in denying his motion for judgment
non obstante verdicto and motion for new trial because there is no evidence to
support the jury=s
verdict.  In his sixth issue, Albert complains that the trial court erred in
denying his motion for new trial because the jury=s
verdict was so against the great weight and preponderance of the evidence as to
be clearly wrong and manifestly unjust.  In analyzing a legal sufficiency
challenge, we must determine whether the evidence at trial would enable
reasonable and fair‑minded people to reach the verdict under review.  City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We must
review the evidence in the light most favorable to the verdict, crediting any
favorable evidence if a reasonable factfinder could and disregarding any
contrary evidence unless a reasonable factfinder could not.  Id. at 821‑22,
827.   We may sustain a no‑evidence or legal sufficiency challenge only
when (1) the record discloses a complete absence of a vital fact, (2) the court
is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact, (3) the only evidence offered to prove
a vital fact is no more than a mere scintilla, or (4) the evidence conclusively
establishes the opposite of a vital fact.  Id. at 810 (citing Robert W.
Calvert, ANo
Evidence@ and AInsufficient Evidence@ Points of Error, 38
Texas L. Rev. 361, 362‑63
(1960)).  We review a ruling on a motion for judgment notwithstanding the
verdict under a legal sufficiency or Ano‑evidence@ standard of review.  City
of Sugar Land v. Home & Hearth Sugarland, L.P., 215 S.W.3d 503, 516
(Tex. App.CEastland
2007, pet. den=d).      In
analyzing a factual sufficiency challenge, we must consider and weigh all of
the evidence and determine whether the evidence in support of a finding is so
weak as to be clearly wrong and unjust or whether the finding is so against the
great weight and preponderance of the evidence as to be clearly wrong and
manifestly unjust.  Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex.
2001); Pool v. Ford Motor Co., 715 S.W.2d 629 (Tex. 1986); In re King=s Estate, 244 S.W.2d
660 (Tex. 1951).  When conducting a factual sufficiency review, we cannot
substitute our judgment for that of the jury.  Pool, 715 S.W.2d at
635.   The jury is the sole judge of the credibility of the witnesses and the
weight to be given to their testimony.   Jones v. Tarrant Util. Co., 638
S.W.2d 862, 866 (Tex. 1982). 

Albert
and Janet were married in 1971.  Tiffany is Albert=s stepdaughter, but she grew up with Albert as
her father and called him her Adad.@  Toby is the son of Albert
and Janet.[1]  Neither Toby
nor Tiffany were living in the home with Janet and Albert at the time of Janet=s death. Albert testified
at trial that Janet died on March 15, 2000.  Albert testified that on that day
he woke up between 4:30 and 5:00 a.m. and that Janet woke up sometime before
7:00 a.m.  Janet went for a massage at 8:15 that morning.  Janet returned around
9:30 that morning, and she and Albert went to pick up their vehicle from the
repair shop.  Albert and Janet returned home, and then Albert left again to
have a flat tire repaired on another vehicle.  Albert testified that, when  he
got home around noon, Janet was eating lunch.   Janet had prepared a plate for
Albert, and he ate with her.  After lunch, Janet went to take a nap in Tiffany=s former bedroom. 

Albert
testified that he changed clothes and left the house at about 12:40 p.m. while
Janet was taking a nap.  Albert drove sixty miles to their ranch.  Albert
stated that he returned home at 5:00 p.m. and that he went into Tiffany=s former bedroom to wake
Janet.  Albert found Janet lying on her left side covered in an afghan with her
head on a pillow.  Albert saw a pistol lying twelve to eighteen inches from
Janet, and he moved the pistol.  Albert moved Janet in order to find a pulse. 
Albert then called 911. 








Jerry
Powers is  a firefighter and paramedic for the City of Stephenville.  Powers
testified that he was working on March 15, 2000, and that, around 5:00 p.m., he
received a call concerning a gunshot victim.  Powers, Gary Sipes, and Brad
Smith responded to the call.  When they arrived at the Peek residence, Powers
testified that Janet was lying diagonally across the foot of the bed with her
feet Ahanging off to
one side@ and her right
arm hanging off of the side of the bed.  Janet was lying on her back looking up
and had blood above her right ear that had run down her chin to the mattress.
Janet=s nose was
completely stopped up with blood.  Powers stated that there was no electrical
activity coming from Janet=s
heart and that they did not try to resuscitate Janet because Ashe=d been down too long.@  There was a pistol in the room on top of a
suitcase, and Albert told Powers that the pistol was the weapon used in the
shooting. 

Sipes
testified that he noticed the gun in the room and that the gun was Aclean, no blood or matter
on the barrel.@  Sipes
further stated that, when he first entered the room where Janet was located,
Albert was touching Janet=s
neck and saying, AI
believe she=s still
breathing.@  Smith
testified that, when the paramedics arrived at the scene, Janet showed no signs
of life and that it was obvious that she was dead.  Sipes stated that Albert
was not crying and showed no emotion. 

Gregory
Wayne Stewart, a former deputy sheriff for Erath County, testified that he
responded to a call at the Peek residence.  Deputy Stewart said that the
paramedics and Albert were with Janet when he arrived.  Deputy Stewart stated
that he observed Janet and that there was no gunpowder or blood on Janet=s hands.  Albert showed
Deputy Stewart the gun used in Janet=s
death.  The gun was lying on a piece of luggage near the bed.  Albert told
Deputy Stewart that he had moved the gun to the suitcase but did not give a
reason for moving the gun.  Albert told Deputy Stewart that he found the gun
lying Aa foot or two,
two or three feet away from the body.@ 
Deputy Stewart said that Janet had a gunshot wound on the right side of her
head and that the location where Albert stated he found the gun to the left of
Janet would not be possible.  Deputy Stewart stated that Albert showed no
emotion and was Ajust
ice cold.@   Deputy
Stewart told the justice of the peace at the scene that Asomething wasn=t
right, that [Janet] didn=t
shoot herself.@ 

Pam
Sparks, Justice of the Peace for Erath County, testified that she went to the
Peek residence the day of Janet=s
death.  Sparks stated that she previously worked in the Dallas County Medical Examiner=s Office and that she had
examined a lot of death scenes.  Sparks stated that she conducted her own
investigation at the scene and that she noticed some Apeculiar things.@  
Sparks testified that she was concerned that Albert had moved the gun, that the
gun and Janet=s hands
were clean, and that Janet=s
body was lying at a peculiar angle to have shot herself in the head.  Sparks
stated that Albert was Acalm
and collected,@ that
he showed her Janet=s
medications, and that he talked about Janet=s
life insurance policies.  Janet=s
death was ruled Aundetermined@ on the death certificate. 








Dr.
Patrick Edward Besant-Matthews, a pathologist, testified that he reviewed the
autopsy report of Janet=s
death to determine Janet=s
manner of death.  The autopsy report indicated that Janet=s stomach contained Anear solid food.@  Dr. Besant-Matthews
stated that, because Janet=s
stomach contained near solid food, her time of death was near the time she
ate.  Dr. Besant-Matthews further testified that Janet had lividity,
post-mortem pooling of blood, on both sides of her back.  Therefore, Janet was
lying on her back long enough for blood to settle.  Albert testified that Janet
was lying on her side when he found her.  Dr. Besant-Matthews stated that it
would be impossible for lividity to set in on both sides of Janet=s back in the seven minutes
that it took the paramedics to respond to Albert=s
call.  Janet had a contact gunshot wound on the right side of her head above
her ear.  The bullet proceeded Aright
to her left, slightly upwards, and slightly from front to back.@ After examining the wound
and angle of the bullet, Dr. Besant-Matthews concluded that it would have been
difficult for Janet to have shot herself.  Dr. Besant-Matthews stated that it
was very unlikely that Janet committed suicide. 

Larry
Wand, with the Erath County Sheriff=s
Office, investigated Janet=s
death.  Deputy Wand testified that Albert did not show any remorse or emotion
concerning Janet=s
death.  Deputy Wand stated that Albert=s
response was Aout of
character@ for the
death of a loved one.  During his investigation, Deputy Wand interviewed Janet=s friends and family,
including Toby and Tiffany. Nothing in the interviews was consistent with Janet
committing suicide.  Deputy Wand stated that Janet was excited about living and
not suicidal.  Deputy Wand determined that Janet and Albert did not have a
happy marriage.  Deputy Wand stated that Albert had not contacted Tiffany or
Toby to inform them of Janet=s
death.  Albert also had not notified Janet=s
parents of her death.  Based upon his investigation, Deputy Wand concluded that
Janet did not commit suicide. 








Tiffany
testified that Janet and Albert had never had a happy marriage and that the
Peek family was Aa
very abusive, stressful family environment to live in.@  Tiffany stated that Albert was not
affectionate with Janet and that he demeaned and humiliated her.  Tiffany
testified that, in February 2000, she witnessed an argument between Albert and
Janet and that Janet Astood
up to [Albert].@ 
Tiffany felt it was Adangerous@ for Janet to stand up to
Albert.  Tiffany was planning her wedding before Janet=s death, and Tiffany testified that Janet was
looking forward to the wedding.  Tiffany stated that, the last time she saw
Janet, the two were planning to meet the following week for Tiffany to show
Janet her wedding dress.  Tiffany further testified that, on the day of Janet=s death, friends of her
uncle, Charles Peek, came to her house and informed her that Janet had killed
herself.  Tiffany responded that Albert killed Janet.  Albert never called
Tiffany concerning Janet=s
death. 

Toby
testified that he talked to Janet the night before her death.  Toby told Janet
that he and his wife were moving back to Texas, and Janet made plans to help
them look for a house.  Toby stated that Janet had wanted to be a grandmother
and that he had told her he and his wife were planning on starting a family. 
The following day, Charles Peek called Toby at work to inform him that Janet
had committed suicide. 

Richard
Ernest, an independent forensic firearms consultant, explained the concepts of Arecoil@ and Amuzzle imprint@ to the jury.  Ernest
stated that recoil and muzzle imprints can be used in making conclusions about
the orientation of a weapon at the time of a person=s death.  Ernest reviewed the autopsy report
and other evidence related to Janet=s
death.  Ernest was also provided the gun used in Janet=s death.  Ernest stated that the gun was sharp
along the edge of the barrel.  Ernest stated that the edge of the gun would
leave a mark on the skin and that Janet=s
skin had a mark matching the barrel of the gun.  After reviewing the evidence
relating to the position of the gun necessary to leave the mark found on Janet=s skin, Ernest concluded
that it would be Ahighly
unlikely@ that Janet
shot herself. 

Albert
offered the testimony of Max Courtney, who owned a forensic consulting
company.  Courtney disagreed with Ernest=s
opinion determining the orientation of the gun based upon the muzzle imprint
left on Janet=s skin. 
Courtney stated that the evidence supported the fact that Janet committed
suicide, but he did not rule out that the death might have been a homicide. 
James Booker, a consultant in firearms and toolmarks, also testified at trial
and disagreed with Ernest=s
opinion on the orientation of the weapon.  Booker had no opinion on whether
Janet=s death was a
murder or suicide.  Dr. Randall Frost, Deputy Chief Medical Examiner for Bexar
County, testified that a person could not determine the position of the gun by
looking at the wound on Janet=s
skin. Dr. Frost stated that Janet=s
death was most likely a suicide.  Dr. Lynn Salzberger, who performed the
autopsy on Janet, also testified that she believed Janet=s death was a suicide. 








The
jury found that Albert intentionally and knowingly shot Janet with a firearm. 
The jury heard evidence that it was very unlikely that Janet killed herself. 
There was expert testimony that the wound and the angle of the bullet made it
highly unlikely that Janet shot herself.  The evidence also shows that Albert
stated he found the gun two or three feet from Janet=s body, which would be unlikely if she shot
herself.  There was also evidence contradicting Albert=s testimony that he found Janet on her side. 
The record shows that Janet had lividity in her back, which shows Janet had
been lying on her back for some time.  Janet=s
hands did not have any blood or gunpowder on them.  Albert was the last person
to see Janet alive, and he was the person who found her. Albert admitted
handling the gun used to kill Janet.  The evidence was legally and factually
sufficient to support the jury=s
finding.  Albert=s
third, fourth, fifth, and sixth issues on appeal are overruled.

In
his first issue on appeal, Albert complains that the trial court erred in
admitting Athe opinion
testimony of an >expert= witness when the opinion
is without reliable foundation and presents a substantial danger of confusing
the issues and misleading the jury.@ 
Albert argues that the trial court erred in allowing Ernest to testify
regarding the orientation of the gun against Janet=s head when it was fired.  Tex. R. Evid. 702 states: 

If
scientific, technical, or other specialized knowledge will assist the trier of
fact to understand the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience, training, or education
may testify thereto in the form of an opinion or otherwise.

 

Expert
testimony is admissible if (1) the expert is qualified and (2) the testimony is
relevant and based on a reliable foundation.  Cooper Tire & Rubber Co.
v. Mendez, 204 S.W.3d 797, 800 (Tex. 2006); Helena Chem. Co. v. Wilkins,
47 S.W.3d 486, 499 (Tex. 2001); E.I. du Pont de Nemours & Co. v.
Robinson, 923 S.W.2d 549, 556 (Tex. 1995).  If the expert=s scientific evidence is
not reliable, it is not evidence.  Mendez, 204 S.W.3d at 800; Merrell
Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 713 (Tex. 1997).  The trial
court=s determination
that these requirements are met is reviewed for abuse of discretion.  Wilkins,
47 S.W.3d at 499.  The test for abuse of discretion is whether the trial court
acted without reference to any guiding rules or principles.  Mendez, 
204 S.W.3d at 800; Robinson, 923 S.W.2d at 558.   Admission of expert
testimony that does not meet the reliability requirement is an abuse of
discretion.  Mendez, 204 S.W.3d at 800;  Guadalupe‑Blanco River
Auth. v. Kraft, 77 S.W.3d 805, 810 (Tex. 2002).








 In
deciding whether an expert is qualified, the trial court must ensure that those
who purport to be experts truly have expertise concerning the actual subject
about which they are offering an opinion.  Mendez, 204 S.W.3d at 800; Gammill
v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 719 (Tex. 1998). 
Scientific testimony is unreliable if it is not grounded in the methods and
procedures of science and amounts to no more than a subjective belief or
unsupported speculation.  Mendez, 204 S.W.3d at 800; Robinson,
923 S.W.2d at 557.  Expert testimony is unreliable if there is simply too great
an analytical gap between the data and the opinion proffered.  Mendez,
204 S.W.3d at 800; Gammill, 972 S.W.2d at 727.  We are not required to
ignore fatal gaps in an expert=s
analysis or assertions that are simply incorrect.  Mendez, 204 S.W.3d at
801; Volkswagen of Am., Inc. v. Ramirez, 159 S.W.3d 897, 912 (Tex.
2004).  A flaw in the expert=s
reasoning from the data may render reliance on a study unreasonable and render
the inferences drawn therefrom dubious.  Under that circumstance, the expert=s scientific testimony is
unreliable and, legally, no evidence.  Mendez, 204 S.W.3d at 801; Havner,
953 S.W.2d at 714.

In 
Robinson, the court identified six factors that trial courts may
consider in determining whether expert testimony is reliable:

(1) the extent to
which the theory has been or can be tested;

 

(2) the extent to
which the technique relies upon the subjective interpretation of the expert;

 

(3) whether the
theory has been subjected to peer review and/or publication;

 

(4) the technique=s potential rate of error;

 

(5) whether the
underlying theory or technique has been generally accepted as valid by the
relevant scientific community; and

 

(6) the non‑judicial
uses which have been made of the theory or technique.  

 

Robinson,
923 S.W.2d at 557.  The factors in Robinson are nonexclusive, and Rule
702 contemplates a flexible inquiry.  Mendez, 204 S.W.3d at 801.  The  Robinson
factors cannot always be used in assessing an expert=s reliability, but Athere must be some basis for the opinion
offered to show its reliability.@ 
Mendez, 204 S.W.3d at 801; Gammill, 972 S.W.2d at 726.   The Robinson
relevance and reliability requirements apply to all expert testimony.  Mendez,
204 S.W.3d at 801.








The
trial court is not required Ato
admit opinion evidence which is connected to existing data only by the ipse
dixit of the expert.@ 
Mendez, 204 S.W.3d at 801.   If the expert brings only his credentials
and a subjective opinion, his testimony is fundamentally unsupported and,
therefore, of no assistance to the jury.  Mendez, 204 S.W.3d at 801; Havner,
953 S.W.2d at 712.   Rule 702, by its terms, only provides for the admission of
expert testimony that actually assists the finder of fact.  Mendez, 204
S.W.3d at 801.  

Ernest
testified that the recoil from the gun left an abrasion on Janet=s head.  Ernest concluded
that the top of the gun was turned toward Janet=s
face to make the abrasion.  Ernest testified that it would be Ahighly unlikely@ that Janet shot herself
with the gun at that orientation. Ernest also testified about a demonstration
he prepared to illustrate his opinion about the orientation of the gun.  
Ernest stated that he fired the gun into a stack of carbon paper, card stock paper,
rubber, and phone books to demonstrate the marks left when the gun was fired at
different orientations.  He fired the gun with the top of the gun at different
orientations, like those on a clock.  Ernest stated that, at the 3:00 o=clock position, the gun
registered a mark like the abrasion on Janet=s
head.  The demonstration illustrated his conclusion that the top of the gun was
turned toward Janet=s
head making it unlikely that she shot herself.  Ernest described the
demonstration to the jury, but no other evidence of the demonstration was
presented.  

Albert
does not argue that Ernest was not qualified as an expert.  Albert specifically
argues that Ernest=s
testimony was not based upon a reliable foundation.  Albert presented testimony
from other experts that it would be impossible to determine the orientation of
the weapon based upon the abrasion on Janet=s
head.  








Ernest
testified that he has many years of experience in firearms and ballistics and
that he has  seen Athousands@ of gunshot wounds.  Ernest
described the concepts of recoil and muzzle imprint to the jury.  Ernest
testified that muzzle imprint and recoil can assist in making conclusions about
the orientation of the weapon at a person=s
death.   Ernest stated that Athere
have been books written on the subject, papers given on the subject, so it=s . . . something that=s well known within the
scientific community.@ 
The jury viewed a video demonstrating the recoil effect of the weapon.  Ernest=s opinion was based upon
his experience and knowledge of recoil and muzzle imprint, and his review of
the autopsy report describing Janet=s
wound.  Ernest=s
demonstration was not introduced to the jury as a scientific theory.  The trial
court did not abuse its discretion in admitting Ernest=s testimony.  Moreover, Dr. Besant-Matthews
testified without objection that the angle of the bullet and the wound on Janet
indicate that the top of the gun was directed toward her eyebrow and eye area. 
Any error in admitting cumulative evidence is harmless.   Nat=l Freight, Inc., v. Snyder,
191 S.W.3d 416, 423 (Tex. App.CEastland
2006, no pet.).  Dr. Besant-Matthews stated that it would be difficult for
Janet to have shot herself with the gun at that angle.  Albert=s first issue on appeal is
overruled.

In
his second issue on appeal, Albert argues that the trial court erred in
admitting the testimony of Sharon Liston.  Liston testified that she married
Albert in November 1965.  Liston stated that in 1966 she and Albert had an
argument.  Liston decided to sleep on the couch.  Liston testified that she
opened her eyes and that Albert was standing over her with a gun pointed at her
head.  Liston ran to the bathroom and locked the door.  Liston and Albert later
divorced.  

Albert
objected to Liston=s
testimony pursuant to Tex. R. Evid.
404(b).  Rule 404(b) provides:

Evidence
of other crimes, wrongs, or acts is not admissible to prove the character of a
person in order to show action in conformity therewith.  It may, however, be
admissible for other purposes, such as proof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of mistake or accident.

 

The trial court admitted the testimony to show identity as provided in
Rule 404(b). 

We
review a trial court=s
decision to admit or exclude evidence for an abuse of discretion.  Robinson,
923 S.W.2d at 558.  We will reverse the decision of the trial court only if it
acted arbitrarily, unreasonably, or without reference to any guiding rules or
principles.   Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238,
241-42 (Tex. 1985).  

The
identity of the person who shot Janet was an issue for the jury to determine. 
Albert=s theory at
trial was that Janet killed herself.  Liston=s
testimony that Albert held a gun to her head while she was sleeping was similar
to the facts surrounding Janet=s
death.  See Johnston v. State, 145 S.W.3d 215, 220-21 (Tex. Crim. App.
2004).  Albert contends that the testimony was not relevant evidence because
the incident was too remote.  Remoteness does not per se render an extraneous
offense irrelevant.  See Linder v. State, 828 S.W.2d 290, 297 (Tex. App.CHouston [1st Dist.] 1992,
pet. ref=d).  The
trial court did not abuse its discretion in admitting Liston=s testimony.  Albert=s second issue is
overruled.








Toby
and Tiffany bring one cross-point in which they argue that the trial court
erred in excluding relevant evidence at trial.  Albert received an expunction
order on his entire criminal file pursuant to Tex.
Code Crim. Proc. Ann. art. 55.01(a)(1)(A) (Vernon 2006).  Tiffany and
Toby filed a notice of deposition and request for production seeking to have
the Erath County District Clerk produce the criminal investigation file.  The
trial court granted Albert=s
motion to quash the notice and for a protective order.  Toby and Tiffany argue
that the trial court erred in preventing them from obtaining relevant evidence
against Albert.  We need not address the cross-point because of our disposition
of Albert=s issues on
appeal.  Tex. R. App. P. 47.1.

The
judgment of the trial court is affirmed.

 

 

JIM R. WRIGHT

CHIEF JUSTICE

 

February 28,
2008

Panel consists of: Wright, C.J.,

McCall, J., and Strange, J.









[1]Toby obtained  a court order changing his name from
Toby Peek to Toby Rudik after the death of Janet.