**REVERSE and RENDER; and Opinion Filed August 25, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01223-CV

### ONCOR ELECTRIC DELIVERY COMPANY LLC, Appellant
### V.
### SOUTHERN FOODS GROUP, LLC D/B/A SCHEPPS DAIRY, Appellee

**On Appeal from the 192nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-10-07222-K**

## OPINION

Before Justices O'Neill, Myers, and Brown
Opinion by Justice Brown

A jury found that the negligence of appellant Oncor Electric Delivery Company, LLC (Oncor) caused a fire at a milk processing plant owned by appellee Southern Foods Group, LLC d/b/a Schepps Dairy (Schepps Dairy). Based on the jury's verdict, the trial court rendered judgment for Schepps Dairy in the amount of $357,095.72. In three issues, Oncor contends that the evidence was legally and factually insufficient to support the jury's verdict and the trial court's judgment. Because we conclude that the evidence was insufficient to establish that Oncor's negligence was the cause in fact of the fire, we reverse the trial court's judgment and render judgment for Oncor.

BACKGROUND

On June 25, 2008, there was a fire at a transformer bank at Schepps Dairy's milk processing plant in Dallas. Oncor owned, operated, and maintained electric lines and other equipment at the Schepps Dairy plant, including the rack-mounted transformer bank. This equipment was used to deliver electric power from Oncor to Schepps Dairy at a "point of delivery," defined for the jury as "the point in at which electric power and energy leaves the electric lines, and other equipment, including transformers, owned by" Oncor. Although no one was injured, the fire caused property damage to both Schepps Dairy and Oncor.

After both parties conducted investigations, Schepps Dairy brought suit against Oncor for negligence, alleging that that the fire was caused by "a faulty and/or loose Oncor terminal connection to a pole mounted transformer" that overheated. Later, Schepps Dairy amended its pleading to allege more generally that the fire "originated at the center transformer" on the bank; Oncor had been notified that its equipment at the bank was "faulty, loose, and/or in need of maintenance and repair"; but Oncor "failed to take reasonable and adequate corrective measures." Schepps Dairy alleged that the fire was proximately caused by Oncor's negligence, including Oncor's "fail[ure] to own, operate and maintain its electric lines and other equipment, including the rack-mounted transformer bank in question, in accordance with good utility practice."

At trial, Schepps Dairy sought to prove that the fire started in the center transformer in a group of three transformers on the rack. Witnesses testified that on the night of the fire, they saw flames coming out of the transformers above the point of delivery on the bank. One eyewitness testified that he saw "electricity" go inside the transformer; the transformer "blew out"; and burning oil that "looked like lava" came out of the top of the transformer. The evidence also

showed that in 2003 and 2005, Oncor had replaced the center transformer because it was leaking oil.

In 2005, after the second replacement, Oncor conducted a study to determine the cause of the leaks. Terry Mayo, an electrical engineer and Oncor employee, conducted the study and testified at trial. His report was introduced into evidence, and stated that "[a] thermal infrared inspection of the bank revealed that the center transformer is running significantly hotter than the other transformers in the bank." Mayo concluded that the transformer bank was overheating "due to harmonic currents." His report suggested three options for "solving the transformer heating problem," including two that would have to be undertaken by Schepps Dairy rather than Oncor. Neither Mayo's report nor these options, however, were ever communicated to Schepps Dairy. Schepps Dairy conducted its own inspections in 2005, 2007, and 2008, and observed "hot spots" on the center transformer. Schepps Dairy offered evidence at trial that these observations had been reported to Oncor by using Oncor's automated telephone system.

Three expert witnesses testified at trial. All were electrical engineers. Oncor's expert witness, Hunter Sims, testified that electrical arcing occurred in the conduit on Schepps Dairy's side of the point of delivery due to a failure in the insulation surrounding Schepps Dairy's wiring. Maintenance of this equipment was the responsibility of Schepps Dairy.

Schepps Dairy's first expert witness, Lacie Smith, had expertise in determining the origin and cause of fires and explosions. Smith opined that the fire started at a loose connection on the left lug of the center transformer. This loose or "hot" connection was the cause of the fire. Smith explained:

> The hot connection eventually ignited, I believe, the combination of leaking transformer oil, from around—leaked out from around the bushing and mixed with wiring insulation, so it was [a] combination of the two where the first flame occurred.

The "classic hot connection" was "a maintenance problem on the part of Oncor," probably occurring when the transformer was installed, but becoming worse over time. On cross-examination, Smith also clarified that he was not offering any opinion about two of the possible causes of overheating in the transformer identified in Mayo's report, the "effect of harmonics as the cause and origin of the fire," or Schepps Dairy's "power factor."

A third expert, Lynn Montgomery, testified on behalf of Schepps Dairy. Because two of Oncor's three issues on appeal relate to Montgomery's opinions, we discuss the substance of his testimony in detail below. In its operative responses to Oncor's requests for disclosure, Schepps Dairy explained the substance of Montgomery's opinions: (1) the fire originated at the center transformer; (2) the fire was not caused by harmonic currents on Schepps Dairy's side of the point of delivery; (3) Schepps Dairy's demand for power was within the capability of the transformer bank; (4) the fire was not caused by any of Schepps Dairy's equipment on its side of the point of delivery; (5) Oncor is responsible to construct, own, operate, and maintain its electric lines and other equipment, including transformers, on its side of the point of delivery in accordance with good utility practice, and (6) "[t]he fire was caused by Oncor's failure to own, operate and maintain its electric lines and other equipment, including the transformer bank in question, in accordance with good utility practice."

The jury did not accept either Sims's or Smith's testimony. The jury was asked a specific question premised on Smith's opinion, whether "the negligence, if any, of [Oncor] in the installation of the conductor and lug on the center transformer proximately cause[d]" Schepps Dairy's damages. The jury answered this question "no," and also answered "no" to the question whether Schepps Dairy's negligence was a proximate cause of its damages, thus rejecting Sims's theory of faulty insulation on wires on Schepps Dairy's side of the point of delivery.

The jury did find, however, that Oncor's negligence proximately caused "the occurrence in question." This inquiry was made in Question 1 of the jury charge. The instructions accompanying Question 1 included definitions of "negligence," "ordinary care," "proximate cause," "point of delivery," and "good utility practice." The definitions of ordinary care were specific to each party. For Oncor, "ordinary care" was defined as "the failure of [Oncor] to own, operate and maintain its equipment, including the rack-mounted transformer bank in question, in accordance with good utility practice." The definition also included an explanation that Schepps Dairy assumed responsibility "for electric power delivered to it and past the point of delivery." "Good utility practice" was defined as follows:

> "Good utility practice" means any of the practices, methods, and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods, and acts that, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety, and expedition. Good utility practice[ ] [is] not intended to be limited to the optimum practice, method, or act, to the exclusion of all others, but rather is intended to include acceptable practices, methods, and acts generally accepted in the region.

The definitions concluded with an explanation that Oncor "shall not be found negligent for any act or event beyond its control which could not be reasonably anticipated and prevented through the use of reasonable measures, including, but not limited to, unavoidable accident or breakdown or accident to machinery or equipment."

The jury answered "yes" to Question 1 as to Oncor, and in response to Question 4, found amounts to reasonably compensate Schepps Dairy for its damages. The trial court rendered judgment on the jury's verdict. This appeal followed.

–5–

## STANDARDS OF REVIEW

In its first issue, Oncor complains that the evidence is legally and factually insufficient to support the jury's answer to Question 1. In reviewing a verdict for legal sufficiency, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the jury's finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. Evidence that does no more than create a surmise or suspicion is insufficient to rise to the level of a scintilla and, in legal effect, is no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

In reviewing a factual sufficiency challenge, we consider and weigh all the evidence in support of and contrary to the finding and will set aside the verdict only if the evidence supporting the jury finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In making this review this Court is not a fact finder, and we will not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Tex. Farmers Ins. Co. v. Cameron*, 24 S.W.3d 386, 392 (Tex. App.—Dallas 2000, pet. denied).

In its second issue, Oncor contends the trial court committed reversible error by permitting Montgomery to testify regarding causation and breach because his testimony was not reliable. Expert testimony is admissible if the expert is qualified and the testimony is relevant and based on a reliable foundation. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800

(Tex. 2006). "If the expert's scientific evidence is not reliable, it is not evidence." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 713 (Tex. 1997)). We review the trial court's determination that these requirements are met for abuse of discretion. *Id.* Admission of expert testimony that does not meet the reliability requirement is an abuse of discretion. *Id.*

In its third issue, Oncor contends that under its tariff, it had no duty to warn Schepps Dairy of any conditions on Schepps Dairy's side of the point of delivery. Oncor contends that the trial court erred by denying its motions for directed verdict and for new trial on this issue. We review these rulings under a legal sufficiency or no evidence standard of review. *See City of Keller*, 168 S.W.3d at 823.

## SUFFICIENCY OF THE EVIDENCE

Oncor contends that because the jury rejected the conclusions of both Sims and Smith as to the cause of the fire, only Montgomery's testimony remains to support the jury's finding that Oncor's negligence was the proximate cause of damage to Schepps Dairy. Oncor argues that Montgomery failed to connect the alleged negligent acts or omissions of Oncor to the specific rather than the generalized risk of fire; failed to conduct necessary investigations to prove his hypothesis or disprove alternatives; and failed to explain how the evidence demonstrated that Oncor failed to meet the standard of care. Oncor argues that in light of these failures, there was no evidence of proximate cause.

### 1. Proximate cause

In a negligence case, a plaintiff must prove the defendant owed a legal duty to the plaintiff, the defendant breached that duty, and the breach proximately caused the plaintiff's injury. We explained the proximate cause requirement in *Connaway v. Village Farms, L.P.*, 200 S.W.3d 353, 356 (Tex. App.—Dallas 2006, no pet.). Proximate cause consists of cause in fact and foreseeability. *Id.* (citing *Sw. Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 274 (Tex.

–7–

2002), and *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)). These elements cannot be established by mere conjecture, guess, or speculation. *Id.* The test for cause in fact is whether the negligent act was a substantial factor in bringing about the injury, without which the harm would not have occurred. *Id.* Cause in fact is not shown if the defendant's negligence merely provided a condition that made the injury possible. *Id.* Rather, the evidence must go further and show that the negligence was the proximate, and not the remote, cause of the resulting injuries and justify the conclusion that the injury was the natural and probable result of the negligence. *Id.* Even if the injury would not have occurred "but for" the defendant's conduct, the connection between the defendant and the plaintiff's injuries may be too attenuated to constitute legal cause. *Id.* The test for foreseeability is whether a person of ordinary intelligence should have anticipated the danger created by the negligent act. *Id.*

### 2. Expert testimony

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. As we have noted, the expert must be qualified and the testimony must be relevant and based on a reliable foundation. *Mendez*, 204 S.W.3d at 800. Oncor contends that Montgomery's testimony is not based on a reliable foundation.

Scientific testimony is unreliable if it is not grounded in the methods and procedures of science and amounts to no more than a subjective belief or unsupported speculation. *Id.* (quoting *E.I. duPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995)). Expert testimony is also unreliable if there is too great an analytical gap between the data and the opinion proffered. *Id.* (quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex. 1998)).

In *Robinson*, the supreme court identified six factors that trial courts may consider in determining whether expert testimony is reliable: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *Robinson*, 923 S.W.2d at 557. These factors are non-exclusive and the inquiry is flexible. *Mendez*, 204 S.W.3d at 801. The factors cannot always be used in assessing an expert's reliability, but there must be some basis for the opinion offered to show its reliability. *Id.* (quoting *Gammill*, 972 S.W.2d at 726).

Expert testimony is required when an issue involves matters beyond jurors' common understanding. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006) (products liability); *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 119–120 (Tex. 2004) (legal malpractice); *Jelinek v. Casas*, 328 S.W.3d 526, 533–34 (Tex. 2010) (medical malpractice). In *Tamez*, the court explained, "[p]roof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition." *Tamez*, 206 S.W.3d at 583. Whether expert testimony is necessary to prove a matter or theory is a question of law. *Id.* With these principles in mind, we review the evidence of causation presented by Schepps Dairy.

### 3. Testimony of Lynn Montgomery

Schepps Dairy contends that its expert Lynn Montgomery provided legally and factually sufficient evidence of proximate cause. Montgomery is a forensic electrical engineer. Schepps Dairy retained him three years after the fire. He inspected Schepps Dairy's facilities and the

Oncor equipment on the site at that time. He interviewed some of the witnesses and reviewed the depositions of others. He reviewed Mayo's report, and inspected the remains of the transformers damaged in the fire. Montgomery explained that he would not testify as to the same matters as Smith, and was not testifying as a fire investigator. He conceded on cross-examination that he had not been able to examine Schepps Dairy's actual wiring from which Oncor alleged the fire had originated, but only had been able to review photographs.

Montgomery testified in some detail to refute Sims's opinions regarding the origin of the fire at the top of Schepps Dairy's conduits. He then turned to the subject of the center transformer. He explained that "excessive heat kills transformers, especially over a long period of time." He said damage to the insulating material would cumulate and cause the transformer to short out. He concluded that transformers normally last for decades, and it was Oncor's responsibility to own, operate, and maintain its transformers in accordance with good utility practice, and to maintain its equipment so that it is safe and reliable.

Next, Mongomery criticized the Mayo report. Among his criticisms, Montgomery opined that Mayo did not "test for everything he should have," yet drew a specific conclusion as a result of his testing. Montgomery explained that Mayo should have tested for "the elephant in the room," that is, "the unbalance that was on the transformer because that causes large currents to circulate within the three transformers which causes a lot of heating." The "circulating current" was "because of having a large single-phase load drawn off of the banks, that's a three-phase bank." The transformers "are not equally loaded." He explained:

> And the middle transformer was the heaviest loaded one of the three. And consistently since all the thermal scans that's ever been run, it's always been the middle transformer that was showing to be running hotter than the other, the two outside ones because it's got the most load. And that current was never measured and I really wanted to measure that current because I think they'd find it was quite high and it does not show up the lines going to Schepps Dairy. It stays up there in the transformers.

–10–

He testified that "unbalance" meant "that the transformers are not carrying equal[ ] amounts of current" and are not "equally loaded." The "unbalance" causes "other internal conditions to the transformer." "They create a driving voltage to circulate current among the three transformers." Measuring the current "going to Schepps plant" would not also measure this "current that's confined in the transformer." The imbalance was not caused by Schepps Dairy's equipment; this balance was "nearly perfect." "The unbalance is because that single-phase load is connected to those three phase transformers and causing the transformers not to be equally loaded, and that's where the big problem is with balance."

Next, Montgomery criticized Oncor's analysis of temperature readings for the transformers and Oncor's conclusion that the readings were "well below the maximum number that the transformer's allowed to run at." The readings at the "skin" of the transformer would be cooler than the temperature at the "hot spot" inside the transformer, because the oil inside the transformer would be "pulling that heat out and discharging it to the air." The measurement inside the transformer would be "much hotter."

As corroborating evidence, Montgomery cited the discharge of oil from each transformer that was installed in the center of the rack. "When a transformer discharges oil, it's overheated for some reason." He also cited thermal scans showing the middle transformer as warmer than the other two. He explained that "one possible cause of that is the single-phase load." This "significant load" on the middle transformer "will heat it up some." He concluded, "[s]o you've got multiple kinds of evidence, all pointing to the fact that this transformer was internally overheating." It was "a false conclusion to think the transformer inside is not in trouble because the skin of the tank is below a certain number."

On cross-examination, Montgomery testified that in his opinion, "the major candidate" for "the most likely cause of this fire" was "unbalanced load factor." He conceded that in his

deposition, he had identified other possible causes. He explained that he had a "relative ranking of probabilities," but had not undertaken an investigation to eliminate the other causes completely. He conceded he did no further investigation after his deposition.

On continued cross-examination, Montgomery listed several possibilities for the cause of a hot spot found in March 2008 on the center transformer, including an installation issue, a corrosion issue, a loosening of the hardware, or an undersizing issue. He had not conducted any investigation to determine which of these possibilities were "either relevant or more likely to have occurred." He agreed that "we still can't identify the actual cause of this heating" on the center transformer in 2007 and 2008. He explained that there were "a number of candidates," and "we'd need to further investigate each of those and eliminate some of them and end up finally with the one."

As to his "unbalanced load" theory, Montgomery explained that the middle transformer carried two-thirds of the total lighting load, while each of the other transformers only carried one-sixth of the total. He testified that this unbalanced load was "creating a residual voltage that causes circulating 60 cycle." He conceded that no one had measured that circulating current to determine if it was "of such a magnitude that it could have caused the heating problem." He stated, "circulating current can reach 100 percent of the transformer rating with just a few volts of residual voltage," and "[it] doesn't take much to make a huge current," but no one had made that determination in this case. Montgomery also conceded that in all of his experience he had never heard of circulating current causing a heating problem on "a high-leg delta bank" such as the transformer bank at Schepps Dairy.

On redirect, Montgomery repeated his opinion that Oncor did not comply with good utility practice in its ownership, operation and maintenance of the transformer bank. The basis for this opinion was as follows:

> The basis for my opinion is that beginning with the initial transformer bank in 1998, there's thermalgraphic evidence of that transformer running hot. After that transformer was replaced the [sic] 2004, transformer there's thermalgraphic evidence that transformer was again running hot. And then in 2005, with the transformer that burned, it was also showing to be running hot. So from 2005 to 2008, there was three years that something could have been done had that information been utilized properly.
>
> In addition to that, we also had instances in all three cases of that same transformer with three different units discharging oil, which is an absolute indication of an internal problem in the transformer because transformers don't discharge oil unless they're in trouble.

He explained that it was not a design problem with the particular transformer but rather its position on the rack: "[i]t is that transformer is being killed by excess heating, which overloading and due to the circulating current cautioned by the single phase load unbalancing the bank is one of the big possibilities here."

He testified about what Oncor could have done to remedy the heating problem it identified in 2005. In the performance of its duties to own, operate, and maintain its equipment in accordance with good utility practice, Oncor could have 1) increased the size of the middle transformer to accommodate the additional load without overloading the transformer and overheating it; 2) made changes to the way Oncor served the load to remedy the situation of the large amount of single phase load on the three phase bank, in accordance with the second recommendation in Mayo's report; or 3) Oncor could have shared its concerns with Schepps Dairy, investigated together, analyzed the problem together, and decided together on the best remedy.

Montgomery explained that Oncor should have anticipated that if the heating problem was not remedied, "you're always risking rupture of the tank and ignition of the fluid, the oil inside." Last, he explained that while he did all the investigation he could on the "customer

side," he could not conduct an investigation on "Oncor's side" because Oncor owned the equipment in question.

Out of the presence of the jury, Montgomery was questioned at length in response to Oncor's objection that Montgomery had not been designated to testify regarding the subjects on which Schepps Dairy was questioning him before the jury. In that hearing, Montgomery explained to the trial court that there were several possible causes of the failure of the center transformer, including overloading, power factor, and harmonics. He testified that the most likely cause was "internal overloading of the transformer bank," due to "circulating current caused by load imbalance." He explained, however, that "I'm not going to say it caused the fire then or now, but there's four candidates." In a second hearing outside the presence of the jury, the trial court asked Montgomery how Oncor was negligent. Montgomery explained that Oncor should have recognized that there was an overheating issue and failed to "take action in a timely manner because they misinterpreted information that they had." He stated that Oncor had a duty to own and operate its equipment in accordance with good utility practice, but did not meet that standard of care. He explained why:

> Because they had information that was sufficient to indicate it had
> a significant and urgent, imminent problem of transformer failure
> and catastrophic fire several years before it happened and they did
> not take care of it. And had they done so, we would not have even
> had a fire.

Significantly, however, Mongomery consistently denied that he would testify about the cause of the fire. He repeated that "I'm not testifying as to the cause of the fire in any way, shape, form." He also explained that he would not testify about "the ignition source of the fire," which was "done by Mr. Smith." He stated, "[n]o, that's cause and origin and I don't do that." He was, however, testifying that "we wouldn't have had the failure that was capable of resulting in a fire." Oncor should have anticipated "the high probability of a transformer failure and

–14–

subsequent fire due to that failure" if the heating problem was not remedied. The trial court ruled that it would allow questioning before the jury on these points.

### 4. Expert testimony of causation

Numerous courts have considered the reliability of expert testimony relating to the cause or origin of a fire. Oncor relies on several cases in which the experts' opinions were rejected. In *Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 840 (Tex. 2010) (per curiam), the court concluded that expert testimony was legally insufficient to support causation regarding a fire in the home of the plaintiffs' son. The son and another victim died in the fire. *Id.* at 837–38. The plaintiffs alleged that a halogen lamp purchased from Wal-Mart caused the fire. The plaintiffs' expert, Dr. Craig Beyler, attributed the fire to "nonpassive failure" of the lamp which ignited a recliner below. *Id.* at 838. He opined that the lamp's halogen bulb exploded, sending burning glass shards on to the recliner. Wal-Mart moved for summary judgment, contending there was no evidence that the lamp was defective or that it caused the fire.

The supreme court explained that "opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact more probable or less probable." *Id.* at 839 (quoting *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 231–32 (Tex. 2004)). The court noted that Dr. Beyler failed to explain how the smoking materials found at the scene could not have caused the fire, and found this failure especially important when there were post-mortem toxicology reports showing that the victims had been smoking the evening of the fire. *Id.* Dr. Beyler had rejected the smoking materials as a cause because he did not find evidence of burnt cigarettes in the area of origin of the fire, but the court pointed out that no evidence of charred or exploded glass had been found in that area, either. *Id.* "An expert's failure to explain or adequately disprove alternative theories of causation makes his or her own theory speculative and conclusory." *Id.* at 840.

–15–

The court also explained that although Dr. Beyler "laid a general foundation for the dangers of halogen lamps," his "specific causation theory amounted to little more than speculation." *Id.* The court concluded, "[e]vidence that halogen lamps can cause fires generally . . . does not establish that the lamp in question caused *this* fire." *Id.* Even though Dr. Beyler "may be qualified in fire research," his testimony in this case "lacks objective, evidence-based support for its conclusions." *Id.* Therefore, Dr. Beyler's testimony was legally insufficient to support causation. *Id.*

Schepps Dairy argues that unlike Dr. Beyler, Montgomery did rule out Sims's alternative theory of causation. Montgomery gave at least two reasons why Sims's theory was incorrect. First, he testified that arcing at the tops of two conduits would not have caused fire in the transformer above, because the fuses would have blown first. Second, Montgomery testified that the insulation on Schepps Dairy's wiring would have self-extinguished "within a few seconds" due to its composition. The jury may have relied on Montgomery's testimony in rejecting Sims's theory. But unlike Dr. Beyler in *Wal-Mart*, Montgomery never offered his own theory of causation other than to opine that Oncor failed to maintain its equipment in accordance with good utility practice. As in *Wal-Mart*, Montgomery's testimony that overheated transformers can cause fires generally does not establish that overheating of *this* transformer caused *this* fire. *See id.* At best, Montgomery supplied several "possible" explanations for the cause of the overheating, including "circulating currents" and unbalanced load. But his testimony did not establish that either of these problems were the result of Oncor's negligence; that either problem caused the overheating of the transformer; or that the overheating of the transformer caused the fire in June 2008.

In *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 633 (Tex. 2009), the jury found that a design defect in an electric clothes dryer caused a fatal fire. The court explained that "a party

–16–

may assert on appeal that unreliable scientific evidence or expert testimony is not only inadmissible, but also that its unreliability makes it insufficient to support a verdict." *Id.* at 638. As here, various expert theories were advanced for the fire's cause. *Id.* at 634. The plaintiffs alleged that a corrugated tube in the dryer's air circulation system became clogged and allowed lint particles to be discharged into the dryer cabinet. The particles ignited, and in turn ignited the clothes in the dryer; the fire then escaped the dryer and ignited the plaintiffs' home. *Id.* at 634. The plaintiffs' expert Judd Clayton, an electrical engineer, testified to support his opinion that the dryer was defectively designed. In an extensive discussion of Clayton's opinions, the court noted that Clayton had not seen or read of a test of his theory that a corrugated lint transport tube in a properly-vented dryer would become clogged to the extent it backed up lint in the blower assembly. *Id.* at 641. Clayton did not personally test his theory. *Id.* Although he based his theory on a report from a federal agency regarding lint-ignition tests, he did not explain how the testing data supported his conclusions, or resolve differences between the data used in the tests and the specific data relevant to the Camachos' dryer. *Id.* at 642.

Reviewing Clayton's testimony under the *Robinson* factors, the court noted that Clayton's theory was not tested; it was developed for litigation; it had not been published or subjected to peer review; and there was no indication it had been accepted as valid by any part of a relevant scientific or expert community at large. *Id.* at 643. Because Clayton's testimony was the only evidence that a design defect in the dryer caused the fire, there was no evidence to support the jury's finding to that effect. *Id.*

Oncor relies on *Camacho* to support its argument that Montgomery did not perform any testing to rule out alternative causes of the fire or even to confirm his own hypothesis. Oncor argues that Montgomery testified only that a fire occurred and Oncor should have anticipated a fire due to heating, without pointing to evidence of any particular defect that caused this

particular fire. Distinguishing *Camacho*, Schepps Dairy argues that lack of relevant testing is only one factor to consider in determining reliability of an expert's opinion. Here, however, Montgomery candidly admitted that in all of his experience he had not heard of his "circulating current" theory occurring before on this type of transformer bank configuration.

In *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d at 575, Tamez was driving a Mack truck tractor hauling a trailer of crude oil. The truck overturned and a fire erupted; Tamez later died from his injuries. The plaintiffs identified Ronald Elwell as an expert on post-collision, fuel-fed fires. Elwell opined that the fire was started by the tractor's battery, which was located too near the fuel tanks, igniting the tractor's diesel fuel, which in turn ignited the trailer's cargo of crude oil. *Id.* The trial court excluded Elwell's testimony as to the cause of the fire. The supreme court held that the trial court did not err by excluding the testimony. *Id.* The supreme court reasoned that Elwell presented no methodology that reliably supported his conclusion that the cause of the fire was a defect in the tractor's fuel and battery systems. The court explained, "[t]he mere fact that the fuel system had a design that could cause the hoses to separate is not evidence that the hoses separated in this case." *Id.* at 581.

The plaintiffs in *Tamez* also contended that even without Elwell's testimony, they presented sufficient evidence to raise a fact issue on causation to preclude summary judgment. The supreme court disagreed, explaining that expert testimony is required to establish causation when "an issue involves matters beyond jurors' common understanding." *Id.* at 583. Whether expert testimony is required is a question of law for the court. *Id.*

Similarly, Schepps Dairy contends that even without Montgomery's testimony, there is some evidence to support the jury's finding of negligence. Schepps Dairy cites to the testimony of a retired Oncor employee, Bill Barnes. Barnes was employed by Oncor as a lead distribution

operations technician ("DOT") in 2005. He initiated and participated in Mayo's investigation of the center transformer at Schepps Dairy, and testified at trial. He testified:

> Q. Over the years as a DOT or a lead DOT basically since 1977, you've seen transformer fires, correct?
>
> A. Yes, ma'am.
>
> Q. So it happens?
>
> A. Yes, ma'am.
>
> Q. And the oil gets overheated and allows a fire to begin, correct?
>
> A. Yes, ma'am. There's other reasons for transformer fires, but that's one of them.
>
> Q. In fact, you've seen this dozens of times in your career?
>
> A. Yes, ma'am.
>
> Q. So for you it wasn't really a question of whether it was going to fail it was a question of when?
>
> A. Yes, ma'am.

Schepps Dairy quotes this testimony and argues that Oncor's "former employee admitted that he knew the center transformer would fail and a fire could result if nothing was done to remedy the transformer heating problem that [Oncor] identified in 2005." Oncor objected, however, to testimony by Barnes "on engineering issues" outside of his participation in the 2005 investigation because Barnes was not designated as an expert witness. The trial court sustained Oncor's objection, and Barnes did not testify regarding the cause of the 2008 fire.[1]

In *Driskill v. Ford Motor Co.*, 269 S.W.3d 199, 202 (Tex. App.—Texarkana 2008, no pet.), the Driskills' car caught fire while turned off and parked in their garage. The fire spread to

---

[1] Schepps Dairy also cites the testimony of two other Oncor employees who agreed that heat generally poses a risk of fire. However, as with Barnes, neither witness testified that overheating of the transformer caused the 2008 fire.

their home, destroying most of their personal belongings. *Id.* Alleging that a defect in the speed control deactivation switch (SCDS) caused the car to catch fire, the Driskills asserted a negligence claim against the manufacturers of the car and the SCDS. *Id.* The manufacturers moved for summary judgment, alleging the Driskills had no evidence of proximate cause. *Id.* at 203–204. The Driskills' expert witness, Bob Dennis, was hired by the Driskills' insurance company to investigate the fire. *Id.* at 205 n.8. The trial court excluded Dennis's testimony about causation of the fire, but permitted his testimony as to the fire's place of origin. *Id.* at 205. Dennis testified the fire originated in the left rear portion of the engine compartment. The SCDS itself was destroyed in the fire, but the Driskills relied on reports by the National Highway Traffic Safety Administration (NHTSA) to argue that the record established facts "meeting the NHTSA criteria for identifying engine compartment fires which were SCDS related." *Id.* The court stated, however, that the "'criteria' contained in the report established only the parameters of the study data rather than establishing a test for determining the cause of a fire." *Id.* The court concluded, "[t]here is no expert testimony bridging the analytical gap between the origin of a fire in the left rear area of an engine compartment and the conclusion that the SCDS in that area was the cause-in-fact of the fire." *Id.* The court continued, "[w]hile the evidence creates a strong suspicion that the defect caused the fire, the suspicion is just that, a suspicion." *Id.*

Relying on *Tamez*, the court stated, "[w]hether the SCDS caused the fire involves complex questions of chemistry, electrical engineering, and hydraulic engineering," and concluded that "[t]he issue is beyond the general experience and common understanding of a layperson." *Id.* Expert testimony was therefore required to establish that the SCDS was the cause in fact of the fire. *Id.* Because the Driskills did not present expert testimony on causation other than the location of the origin of the fire, there was "less than a scintilla of evidence that

the SCDS was the cause-in-fact of the fire in this case." *Id.* The court concluded that the trial court did not err in granting the manufacturers' motions for summary judgment. *Id.*

Similarly, Montgomery testified as to the location of the origin of the fire, offering his expert opinion that Sims's conclusions on the subject were erroneous. He did not, however, offer evidence as to the cause in fact of the fire. He testified that "something could have been done" to address the problem of the transformer "running hot" and discharging oil. He testified that Oncor could have taken specific steps to remedy the heating problem in the center transformer after Mayo completed his investigation in 2005, including increasing the size of the center transformer, making changes to the way Oncor served the load, or creating another solution jointly with Schepps Dairy. But he did not testify that the failure to take any of these steps was the cause in fact of the fire, and he conceded that "we still can't identify the actual cause of this heating" on the center transformer, stating that further investigation would be required.

### 5. The parties' conclusions

Schepps Dairy concludes that Oncor's arguments are not well-taken because they "focus[ ] on the cause of the transformer heating problem," but "this case . . . is about the cause of the June 25, 2008 fire." Schepps Dairy continues, "Schepps Dairy's theory of liability . . . is that [Oncor's] failure to own, operate and maintain its equipment in accordance with good utility practice was a proximate cause of the fire. The underlying cause of the transformer heating problem is not a critical component of this theory." Thus, Montgomery's "circulating currents" and "unbalanced load" theory is only an "ancillary opinion," not "a critical component of Schepps Dairy's theory of liability." Schepps Dairy explains that Oncor knew that a fire could occur if nothing was done to address or remedy the transformer heating problem, and Oncor did nothing. Schepps Dairy concludes, "[t]he June 25, 2008 fire was an event within [Oncor's]

control that [Oncor] could reasonably have anticipated and prevented through the use of reasonable measures." In sum, Schepps Dairy's argument is that because the risk of fire was foreseeable, the cause in fact of the fire is irrelevant in establishing Oncor's negligence.

Oncor responds that foreseeability of the risk of fire, the crux of Schepps Dairy's argument, does not constitute evidence of cause in fact.[2] Montgomery's testimony is about "what Oncor could have anticipated, not what actually happened." As Oncor points out, "the record contains no testimony by Montgomery or any other witness establishing that transformer heating was the cause-in-fact of the fire." Yet all of the actions identified by Montgomery that should have been taken by Oncor, such as increasing the size of the center transformer or moving a service to a new transformer bank, were to address the transformer heating problem.

Sims and Smith both offered testimony of cause in fact. Neither witness testified that overheating caused the fire. According to those experts, the fire was caused either by Oncor's improper installation of a conductor and lug or by Schepps Dairy's faulty wiring. But Montgomery did not criticize Oncor for failing to foresee or prevent fire resulting from either of these circumstances. Instead, Montgomery's opinions were based on Oncor's failure to take measures to cure the overheating problem; specifically, Oncor's failure to address "circulating currents" and "unbalanced load" that in Montgomery's opinion were the most likely cause of the overheating.

Under the strict standards for expert testimony of causation described by the supreme court in *Merrell*, *Camacho*, and *Tamez*, the evidence presented by Schepps Dairy was legally insufficient to establish that Oncor's negligence was a cause in fact of the fire. We sustain

---

[2] In addition, Oncor does not concede that foreseeability was established in any event with respect to Montgomery's unbalanced load theory. The record shows that even Montgomery admitted he had never seen such a problem on the type of transformer bank configuration used here. Oncor argues that the standard of care defined for the jury does not encompass finding and correcting a problem that had never been known to occur.

Oncor's first issue.  In addition, Montgomery's testimony regarding cause in fact was not reliable, especially in light of the limitations Montgomery himself placed upon the scope of his own opinions; for example, his explanation to the trial court that he was "not testifying as to the cause of the fire in any way, shape, form."  Lacking testing, peer review, and general acceptance, Montgomery's opinions regarding the overheating of the transformer leave an analytical gap between Oncor's alleged lack of maintenance of its equipment and the 2008 fire.  *See Mendez*, 204 S.W.3d at 800–801.  The trial court should have sustained Oncor's objections to the admission of Montgomery's testimony of causation.  We sustain Oncor's second issue.

### CONCLUSION

We conclude the evidence was insufficient to support the jury's answer to Question 1 of the jury charge that Oncor's negligence was the proximate cause of the fire.  We sustain Oncor's first and second issues.  We need not reach Oncor's third issue.  We reverse the trial court's judgment and render judgment for Oncor.  *See Jelinek*, 328 S.W.3d at 538 (where evidence of causation legally insufficient, court reversed and rendered judgment that plaintiffs take nothing).

/Ada Brown/
ADA BROWN
JUSTICE

121223F.P05

–23–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

ONCOR ELECTRIC DELIVERY
COMPANY LLC, Appellant

No. 05-12-01223-CV        V.

SOUTHERN FOODS GROUP, LLC D/B/A
SCHEPPS DAIRY, Appellee

On Appeal from the 192nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-10-07222-K.
Opinion delivered by Justice Brown,
Justices O'Neill and Myers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that  Southern Foods Group, LLC d/b/a Schepps Dairy take nothing on its claims against Oncor Electric Delivery Company, LLC.

It is **ORDERED** that appellant Oncor Electric Delivery Company LLC recover its costs of this appeal from appellee Southern Foods Group, LLC d/b/a Schepps Dairy.

Judgment entered this 25th day of August, 2014.