ACCEPTED
06-14-00040-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
1/9/2015 6:53:12 PM
DEBBIE AUTREY
CLERK

# No. 06-14-00040-CV

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
1/12/2015 8:16:00 AM
DEBBIE AUTREY
Clerk

IN THE COURT OF APPEALS
FOR THE SIXTH DISTRICT OF TEXAS

Tillerd Ardean Smith, Medallion Transport & Logistics, LLC, and Tomy Rushing d/b/a Rushing Transport Services, Inc.,

*Appellants*

v.

Brandi Williams,

*Appellee*

On Appeal from the 71st Judicial District Court of
Harrison County, Texas, the Hon. Brad Morin presiding
Trial Court Cause No.12-0889

## APPELLANTS' REPLY BRIEF

<table>
<tr><td>

G.R. (Randy) Akin
State Bar No. 00954900
G.R. RANDY AKIN, PC
3400 W. Marshall Avenue, Suite 300
Longview, Texas 75604
Tel: 903-297-8929
gra@randyakin.com


**ORAL ARGUMENT
REQUESTED**

</td><td>

Thomas C. Wright
State Bar No. 22059400
Wanda McKee Fowler
State Bar No. 13698700
Shelley J. White
State Bar No. 24056520
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, TX 77056
Tel: 713-572-4321
wright@wrightclose.com
fowler@wrightclose.com
white@wrightclose.com

</td></tr>
</table>

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................3

INTRODUCTION ...........................................................................................5

ARGUMENT ..................................................................................................7

    I.      The Spoliation Instruction Was Improper and Harmful. ......................7

           *This record contains no proof of a subjective intent to conceal relevant evidence.*.................................................................8

           *The record does not show that driver's logs before March 18 were relevant to whether Smith was fatigued on April 4.*.........................................................................................11

           *The instruction harmed the Defendants.* ................................12

    II.     Defendants Preserved the Judge's Error in Giving an Instruction on Negligent Hiring and Training......................................13

           *Counsel informed the trial court that the evidence did not support the instructions.* ......................................................14

           *The instructions were harmful.*...............................................16

    III.    The Facebook Photos Were Admissible and Their Exclusion Was Harmful. ...................................................................17

    IV.    The Expert Testimony Does Not Support the Jury's Findings. ....................................................................................22

    V.    The Catch-All "Statutory Employee" Spectre Is a Red Herring..................................................................................31

CONCLUSION..............................................................................................34

CERTIFICATE OF SERVICE ...........................................................................36

CERTIFICATE OF COMPLIANCE.....................................................................36

# INDEX OF AUTHORITIES

**Cases**

*Barham v. Turner Constr. Co. of Tex.*,
  803 S.W.2d 731 (Tex. App.—Dallas 1990, writ denied) ...................................20

*Broders v. Heise*,
  924 S.W.2d 148 (Tex. 1996)...................................................................................29

*Brookshire Bros. Ltd. v. Aldridge*,
  438 S.W.3d 9 (Tex. 2014)...............................................................................8, 12

*Christus Health Se. Tex. v. Broussard*,
  267 S.W.3d 531 (Tex. App.—Beaumont 2008, no pet.) ....................................27

*Clark v. Randalls Food*,
  317 S.W.3d 351 (Tex. App.—Houston [1st Dist] 2010, pet denied.)..................12

*Cooper Tire & Rubber Co. v. Mendez*,
  204 S.W.3d 797 (Tex. 2006) ................................................................................29

*Cortez v. Tomas*,
  No. 02-11-00231-CV, 2012 Tex. App. LEXIS 1092 (Tex. App.—
  Fort Worth Feb. 9, 2012, no pet.)................................................................ 23, 28

*Gammill v. Jack Williams Chevrolet, Inc.*,
  972 S.W.2d 713 (Tex. 1998).................................................................. 22, 28, 29

*Ibrahim v. Gilbride*,
  No. 14-09-00938-CV, 2010 Tex. App. LEXIS 9710 (Tex. App.—
  Houston [14th Dist.] Dec. 9, 2010, no pet.)................................................. 23, 28

*Lopez v. La Madeleine of Tex., Inc.*,
  200 S.W.3d 854 (Tex. App.—Dallas 2006, no pet.)...........................................18

*Pediatrix Med. Serv. Inc. v. De La O*,
  368 S.W.3d 34 (Tex. App.—El Paso 2012, no pet.)............................................30

*Richards v. Tebbe*,
  No. 14-13-00413-CV, 2014 WL 2936425 (Tex. App.—Houston
  [14th Dist.] June 26, 2014, no pet.)....................................................................19

*State Dep't of Highways & Pub. Transp. v. Payne,*
    838 S.W.2d 235 (Tex. 1992) .......................................................... 13, 15, 16

*Tamez v. Sw. Motor Transp., Inc.,*
    155 S.W.3d 564 (Tex. App.—San Antonio 2004, no pet.) ................................32

*Tawa v. Gentry,*
    No. 01-12-00407-CV, 2013 Tex. App. LEXIS 4828 (Tex. App.—
    Houston [1st Dist.] Apr. 18, 2013, no pet.) .........................................25

*Tenet Hosp. Ltd. v. Love,*
    347 S.W.3d 743 (Tex. App.—El Paso 2011, no pet.) ...........................................31

*Thota v. Young,*
    366 S.W.3d 678 (Tex. 2012) ...................................................................15

*Wal-Mart Stores, Inc. v. Johnson,*
    106 S.W.3d 718 (Tex. 2003) ........................................................... 10, 11

*Whirlpool Corp. v. Camacho,*
    298 S.W.3d 631 (Tex. 2009) ...................................................................22

**Statutes**

49 C.F.R. § 376.12(c)(1) ..............................................................................32

**Other Authorities**

1 WEINSTEIN & BERGER, WEINSTEIN'S FEDERAL EVIDENCE §
    301.06[4] at 301–28.3 (2d ed. 2003) .......................................................11

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 39 (11th ed. 2003) ......................17

**Rules**

TEX. R. CIV. P. 193.6(a)(2) ..........................................................................17

TEX. R. EVID. 401 .....................................................................................12

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

Appellants Tillerd Ardean Smith, Medallion Transport & Logistics, LLC, and Tomy Rushing d/b/a Rushing Transport Services, Inc. respectfully file this Reply Brief.

## INTRODUCTION

On appeal, as at trial, Plaintiff wants to focus on anything but the substantive issues. First, Plaintiff's brief virtually ignores the Supreme Court's newest opinion on spoliation, failing to explain why that Court's new guidelines do not control here and dictate a reversal. Plaintiff's brief likewise fails to address the lack of any proof of *intent* to spoliate or any proof of *prejudice* to Plaintiff from spoliation— both necessary elements before a spoliation instruction may be given. And Plaintiff's feigned skepticism that the spoliation instruction they fought so hard for in the trial court harmed Defendants is a diversion as well. The spoliation instruction and the court's refusal to allow impeachment of Plaintiff on the Facebook photos, harmed Defendants because the jury was much less likely to consider *Plaintiff's* own negligence in the accident. After all, she did not slow below the speed limit even when she saw the 18-wheeler truck in the lane next to her travelling 10–20 mph.

Second, in response to Defendants' challenge to show otherwise, the brief also wholly fails to point to any evidence that Smith's clean pre- and post-

5

employment driving records provided a basis for a negligent hiring, training, or supervision instruction or to explain why these instructions also did not harm Defendants.

Third, with regard to Plaintiff's excluded Facebook photos, the brief offers a single case (involving photographs known only to Defendants) that does not apply here, where the photos were not a surprise to Plaintiff because she took them herself and posted them on her Facebook page. Nor does the brief attempt to explain why the trial court acted properly when it refused to allow Defendants to impeach Plaintiff's statement that she did not deer hunt after the accident when her own photos suggest that she did hunt. By refusing to allow impeachment, the court usurped the jury's job to assess credibility.

Fourth, likewise the brief glosses over Defendants' substantive attacks on Plaintiff's experts. Plaintiff never addresses why a non-surgeon, part-owner of a spinal surgery center is qualified to testify as an expert on the intricacies of spinal surgery or why the non-surgeon is qualified merely because the surgery *center* is recognized for its quality. Nor does Plaintiff explain why a doctor without any *vocational rehabilitation* training is qualified to testify as an expert in that field. Moreover, all of the testimony regarding vocational rehabilitation is based on the non-surgeon's testimony that Plaintiff will require a specific type of surgery. In addition, the doctor's testimony on vocational rehabilitation is vague and fails to

show the basis for his expertise; he essentially assumes he is an expert, even though vocational rehabilitation is not mentioned once in his lengthy curriculum vitae.

Finally, the brief asserts that Smith is a statutory employee of Medallion, ignoring Plaintiff's refusal to accept a trial stipulation on Smith's employment status (thereby putting the issue to the jury) and ignoring Plaintiff's failure to secure (i) a jury finding on employment or (ii) a ruling on her directed verdict motion regarding employment. This was a fact issue on which Plaintiff had the burden. In addition, the case law and federal statutes that Plaintiff cites do not dictate that Smith was Medallion's statutory employee.

In short, Defendants have shown the reversible error in the record. On every claim, Plaintiff's brief dodges the underlying substantive problems. Plaintiff has failed to give the Court any blueprint for upholding the judgment. When the Court scrutinizes the briefs, it will conclude that the judgment must be reversed.

## ARGUMENT

### I.    THE SPOLIATION INSTRUCTION WAS IMPROPER AND HARMFUL.

The gist of Plaintiff's position on spoliation is this: *some* logbooks, dispatch records, and waybills were destroyed; as a result the instruction was warranted. This is such a gloss on the law, on Plaintiff's original preservation request, and on the records actually produced that it borders on misdirection.

Under *Brookshire Brothers*, the inquiry examines what documents are unavailable and why they are unavailable.[1] *Brookshire Bros. Ltd. v. Aldridge*, 438 S.W.3d 9 (Tex. 2014). Except for an extremely narrow exception, a spoliation instruction is proper *only* when documents are unavailable because the party intentionally spoliated them by acting "*with the subjective purpose of concealing or destroying discoverable evidence*." *Id.* at 24 (emphasis added). Finally, even if documents are unavailable, a court must consider if the unavailable documents prejudiced the party's case.

*This record contains no proof of a subjective intent to conceal relevant evidence*. Here, as in *Brookshire Brothers*, Defendants produced documents—just not as many as Plaintiff claimed they should have produced. Once this Court examines what was requested and what was produced, it must conclude, as the Supreme Court did in *Brookshire Brothers*, that the record lacks any proof that Medallion intended to conceal relevant evidence.

In *Brookshire Brothers*, a slip and fall case, the grocery store preserved film only from the time the plaintiff entered the store until shortly after his fall. *Id.* at 27–28. This film was saved after the plaintiff notified the store that he wanted

---

[1]   *Brookshire Brothers* also requires the court to consider if a duty exists to preserve documents. *Id.* at 14. Defendants agree that they had a duty to preserve some documents. The dispute here is whether Defendants sufficiently preserved the material and relevant documents; the burden was on Plaintiff to show that any unavailable documents were material and relevant. *Id.* at 20.

footage of the fall. *Id.* The rest of the film for the day was destroyed pursuant to the store's document retention policy. *Id.* at 15. Although the plaintiff's lawyer later requested more footage, the record contained no evidence that this request was made when the extra footage was still available. *Id.* at 27. The Court concluded that Brookshire Brothers did not intentionally destroy evidence—and that this lack of intent precluded an instruction. The record failed to show that the decision as to what film to destroy was "based in any way on what the additional footage would have shown"—which may have shown an intent—and instead the record showed that the store preserved what the plaintiff asked it to preserve. *Id.* at 28.

This case warrants the same conclusion. Three days after the accident, Plaintiff informed Medallion of the April 4, 2011 accident and asked Medallion to preserve dispatch records, driver logbooks, waybills, and fuel records. (CR 150–152) **Plaintiff did not tell Medallion to preserve a specific number of days of these documents**. Medallion's insurer suggested Medallion save *eight* days of each of these documents.

Medallion preserved much more than its insurer suggested: 18 days of driver's logs from before and after the accident, 29 days of waybills immediately preceding the accident, 61 days of fuel records (for March and April), and dispatch records for the 11 months immediately preceding the accident.

9

Plaintiff complained at trial and continues to complain on appeal that she was not given waybills for April 1–4, 2011, but the record indisputedly shows that no waybills existed for April 1st or 2nd—the March 31 waybill covered a trip from March 31 to April 1 and Smith did not work from April 2 to the afternoon of April 3. (4 RR 62–66) Although Smith would have received a waybill on April 3 for the April 4 trip, that waybill was transferred to a different carrier who carried the load after the accident. (4 RR 114–16) So Medallion also did not have this waybill. Plaintiff presented no conflicting evidence on these points. When a party controlling the evidence explains its failure to produce the evidence, then a spoliation instruction is not appropriate. *See* *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003) (noting that a spoliation instruction is appropriate when evidence has been deliberately destroyed or a party cannot explain the non-production). Obviously, Medallion could not produce, and did not destroy, documents it never had.

Moreover, Medallion's representative at trial testified that the company gave Plaintiff seven days of driver's pre-accident logs, which is "common practice" so that one can see the activity of the driver for the week before the accident. (4 RR 114–119, 123–124) Medallion's representative also testified that the company had never preserved six months of driver's logs for an accident. (*Id.*) And, as in *Brookshire Brothers*, this record lacks any evidence showing that Medallion knew

that it was destroying—or did destroy—pertinent evidence or that it engaged in a purposeful effort to conceal relevant evidence.).

*The record does not show that driver's logs before March 18 were relevant to whether Smith was fatigued on April 4.* Plaintiff also claims that she was injured because more driver's logs were not produced; according to Plaintiff, if Medallion had produced more driver's logs, Plaintiff would have been able to show that Smith had a history of driving while fatigued. But a spoliation instruction is appropriate only when the allegedly spoliated evidence is material and relevant to a claim or defense. Here, there is no logical connection between the driver's logs prior to March 18 and whether Smith was fatigued on the day of the accident, April 4.

As to the unproduced driver's logs—where litigation is anticipated, a duty arises to preserve evidence that is material or relevant to the claim. *Wal-Mart Stores*, 106 S.W.3d at 722; *see also* 1 WEINSTEIN & BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 301.06[4] at 301–28.3 (2d ed. 2003) ("[T]here must be a sufficient foundational showing that the party who destroyed the evidence had notice both of the potential claim and of the evidence's potential relevance.").

Thus the issue is whether Smith's driver logs prior to March 18—more than 18 days before the accident—are relevant to the cause of the accident. "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Clark v. Randalls Food*, 317 S.W.3d 351, 357 (Tex. App.—Houston [1st Dist] 2010, pet denied.) (citing TEX. R. EVID. 401). There must be some logical connection between the evidence and the point being proven.

There is no logical connection here between driver's logs pre-March 18 and whether Smith was fatigued on April 4—after a Smith had been off a day and a half. Whether Smith got enough rest in the days preceding March 18 has zero tendency to make his fatigue, if any, on the morning of April 4 any more or less probable. Thus, any driver's logs pre-March 18 are irrelevant, and their non-production is not a basis for a spoliation instruction.

Under *Brookshire Brothers* this Court must conclude that the trial court abused its discretion in giving a spoliation instruction. Likewise, the Court must conclude that Defendants were harmed by the instruction.

**The instruction harmed Defendants**. The spoliation evidence and instruction were part of Plaintiff's overall scheme to gut Defendants' credibility. At its essence, a spoliation instruction informs the jury that a party destroyed evidence to gain an advantage in the suit. *See Brookshire Bros.*, 438 S.W.3d at 13. Introduction of spoliation evidence magnifies the improper conduct. *Id.* As argued in their opening brief, Defendants believed that Plaintiff also was negligent and

that she partly caused the accident because she was going too fast and failed to slow when she saw the 18-wheeler traveling so slowly in the lane next to her. (Ant. Br. at 36–38) But between the spoliation instruction and the two instructions suggesting to the jury that Medallion and Rushing had hired an incompetent employee and had failed to adequately train him, the jury was likely to give little, if any, credence to Defendants, whom the jury was told had improperly destroyed evidence and had hired an incompetent employee then failed to train the employee. In addition, Plaintiff's counsel cross-examined all of the defense witnesses about spoliation. (3 RR 60:1–63:20; 4 RR 62:3–66:17; 79:10–80:10; 82:8–85:5; 92:21–93:20; 117:1–119:11; 122:1–10; 123:3–11; 152:24–156:25; 167:25–169:11; 172:3–176:5; 180:3–184:2; 190:3–191:16; 7 RR 111:20–112:22) He also reread the instruction and emphasized it in closing. (7 RR 152–54) That the jury placed no fault at all on Plaintiff shows the harmful effect of all of the instructions and the spoliation issue.

## II. DEFENDANTS PRESERVED THE JUDGE'S ERROR IN GIVING AN INSTRUCTION ON NEGLIGENT HIRING AND TRAINING.

Plaintiff's counsel apparently wants to return to the days of "gotcha" practice in charge error preservation, where no error was preserved if the right words were not used. *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992). This position is understandable in light of the instructions the judge gave. The judge informed the jury that it could find

Medallion and Rushing negligent if they hired or retained an incompetent driver or failed to adequately train a driver, even though Smith had not had any other accidents or tickets as a commercial driver. (CR 636) Defendants' counsel objected to the instructions, but Plaintiff claims counsel did not make the right objections. This is incorrect.

*Counsel informed the trial court that the evidence did not support the instructions.* Defense counsel objected to both instructions essentially on the same grounds; he claimed they were a comment on the weight of the evidence and said that they told the jury

> that Tillerd Ardean Smith, who's never had a moving violation as a truck driver, who has never had an accident, wreck, collision, anything as a truck driver prior to the date in question is an incompetent employee . . . .

(7 RR 140)

Clearly, this objection informed the judge that no evidence supported the instructions. The question under *State Dep't. of Highways v. Payne* is whether counsel timely and plainly made the trial court aware of the underlying complaint. *Id.*

The Supreme Court reaffirmed the test recently, noting "[a]s we stated twenty years ago, the procedural requirements for determining whether a party has preserved error in the jury charge are explained by one basic test: 'whether the

14

party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.'" *Thota v. Young*, 366 S.W.3d 678, 689 (Tex. 2012) (citing *Payne*, 838 S.W.2d at 241).

The facts of *Thota* are particularly applicable here. The plaintiff in *Thota* objected to the inclusion of a contributory negligence question and to questions relating to new and independent cause and unavoidable accident. *Id.* at 862. The plaintiff argued that there was no evidence to support these questions, but did not advise the trial court that a *Casteel* problem would arise if the questions were included. *Id.* The trial court overruled the plaintiff's objection and the jury found the plaintiff to be responsible for his injuries. *Id.*

In the Supreme Court, the defendant argued that the plaintiff waived his right to appeal the inclusion of the contributory negligence and the new and independent cause instructions because the plaintiff's charge conference objections were not specific enough to put the trial court on notice of the *Casteel* problem. *Id.* at 689–90. The Supreme Court rejected the argument:

> Contrary to [the defendant's] narrow and technical interpretation of our preservation of error requirements, we have never held that a no-evidence objection in this context is insufficient to preserve a broad-form complaint on appeal. Moreover, we have long favored a common sense application of our procedural rules that serves the purpose of the rules, rather than a technical application that rigidly promotes form over substance.

*Id.* at 690 (internal citations omitted).

Here, there is no question that the objection was made timely and that Defendants obtained a ruling. Nor is there any doubt about whether the objection was stated "plainly." *See Payne*, 838 S.W.2d at 241.

As noted above, although Defendants' counsel did not say "no evidence," he made clear to the trial judge that he objected to the inclusion of the negligent hiring and negligent training instruction because:

- Smith never had a moving violation while working as a truck driver. Applying common sense, this informed the court that there was no evidence that Smith ever had a moving violation while working as a truck driver, and therefore no evidence supported the instruction.

- Smith never had an accident, wreck, collision or any other issue prior to the accident. Applying common sense, this informed the court that there was no evidence that Smith ever had an accident, wreck, collision or any other issue prior to the accident, and therefore no evidence supported the instruction.

In short, Defendants plainly objected to the instructions, and the grounds on which they objected were clearly evidentiary ones. Under the Texas Supreme Court's guidelines as reiterated in *Thota*, Defendants' objections are more than sufficient to preserve the issue on appeal.

**The instructions were harmful.** For the same reasons discussed under sections I and V, these instructions harmed Defendants and probably caused the rendition of an improper judgment.

## III. THE FACEBOOK PHOTOS WERE ADMISSIBLE AND THEIR EXCLUSION WAS HARMFUL.

Plaintiff argues that Defendants were trying to ambush her with her own photos, which she posted on Facebook for the world to see. The Court should reject Plaintiff's clever attempt to recast the issue. First, there was no ambush. An ambush, by definition, requires the element of surprise. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 39 (11th ed. 2003). Plaintiff obviously already had possession of her own photos, and had the same or better access to them on her Facebook page as the Defendants had. Second, Defendants' counsel disclosed a copy of the photographs to Plaintiff's counsel before trial and even informed Plaintiff's counsel that he intended to offer the photos for impeachment purposes if Plaintiff testified that she had not hunted since the accident. (2 RR 17–18)

Second, Plaintiff has not argued that she *actually* was surprised that the hunting photos posted to her Facebook page existed, nor could she credibly make such an argument. Plaintiff's sworn testimony establishes that *she* took the photos, *she* possessed the photos, and *she* made the photos available to Defendants and the public by posting them to her Facebook page. (5 RR 44–64) And the photos depicted her activities. Given the undisputed evidence of the absence of *any* surprise, Plaintiff's contention that Defendants have failed to show *unfair* surprise is nonsensical. *See* TEX. R. CIV. P. 193.6(a)(2) (excepting evidence that will not unfairly surprise other party from exclusionary rule).

17

Third, the Dallas Court of Appeals' holding in *Lopez v. La Madeleine of Tex., Inc.*, 200 S.W.3d 854 (Tex. App.—Dallas 2006, no pet.), a case on which the Plaintiff heavily relies, does not support the exclusion of the photos. Those facts are completely different. *Lopez* involved undisclosed surveillance photos—*not* taken by the plaintiff—showing the plaintiff gardening, which the defendant offered during trial to impeach testimony that the plaintiff could no longer engage in such activities due to injuries he sustained while working for the defendant. In considering whether the admission of the surveillance photos was error, the appellate court rejected the defendant's argument that the plaintiff was not unfairly surprised "because the undisclosed evidence depicted [the plaintiff] going about his own activities—activities of which he was obviously aware." *Id.* at 862–63. The only conclusion the *Lopez* holding reasonably can support is that a party may not offer undisclosed evidence the other party does not know exists.

But that is not what happened here. The photos showing Plaintiff hunting and engaging in other activities—each of which contradicted her testimony—were not obtained by some private investigator defendants hired to dress in camouflage and follow Plaintiff through the woods. Nor were they obtained from some hidden camera. These photos were Plaintiff's *own* photos, that she took and made publicly available on her Facebook page. Thus, unlike the *Lopez* plaintiff, Plaintiff knew about the photographs before Defendants found them on Facebook. And Plaintiff

18

had more than just knowledge of the photos' existence—she had possession, custody, and control of the photos. Accordingly, *Lopez* does not dictate the exclusion of the photos here.

Instead, other authorities apply; in these cases the courts found no unfair surprise where the party against whom evidence was offered knew the evidence existed or had equal access to the evidence. For example, in a case decided around the same time as *Lopez*, the Dallas Court of Appeals concluded that the taxpayer in a suit to collect delinquent ad valorem taxes was not unfairly surprised by the offer at trial of his tax statements that were not produced in discovery, noting that those statements were certified public records to which the taxpayer had the same access as the taxing units. *Williams v. Cnty. of Dallas*, 194 S.W.3d 29, 33 (Tex. App.—Dallas 2006, pet. denied).

A similar result was reached in *Richards v. Tebbe,* where the Fourteenth Court of Appeals in Houston held the defendant was not unfairly surprised when the plaintiff did not produce in discovery the transcript of defendant's prior inconsistent testimony from a criminal proceeding. No. 14-13-00413-CV, 2014 WL 2936425, at *7 (Tex. App.—Houston [14th Dist.] June 26, 2014, no pet.). In rejecting an argument for exclusion of the transcript under Rule 193.6—the same rule Plaintiff relies on here—the court concluded there was no unfair surprise because "[the defendant] was aware that the testimony existed, and the transcript

was as readily available to him as it was to [the plaintiff]." *Id.* at 7. The Fourteenth Court even cited *Lopez* for the proposition that rule 193.6 "applies when the *existence* of evidence was not disclosed in a timely manner." *Id.*

The case for admission of the Facebook photos is even stronger here than in *Williams* or *Richards*. Not only did Plaintiff know about the photos—how could she not since she admitted using her cell phone to take them—but she possessed and controlled the photos. Thus, her access to the photos was not equal to Defendants' access—it was superior. Plaintiff does not cite any authority warranting exclusion of the evidence under these circumstances.

Fourth, Plaintiff's only defense of the trial court's refusal to admit the photos during trial as impeachment evidence is that her counsel did not open the door by asking whether she hunted and fished after the accident because he did not inquire specifically inquire about her Facebook activities. A question about whether Plaintiff posted about hunting on Facebook was not required to open the door to the admission of the photos. The dispute here does not concern whether the photos were posted to Facebook—Plaintiff admitted she did that. The dispute concerns whether Plaintiff sustained the injuries she alleged as a result of the accident and whether she was able to hunt after the accident. Photos purporting to show Plaintiff hunting after the accident directly contradicted her testimony. *See, e.g.*, *Barham v. Turner Constr. Co. of Tex.*, 803 S.W.2d 731, 740 (Tex. App.—Dallas 1990, writ

20

denied) (holding photographs obtained in violation of disciplinary rules, which showed plaintiff performing air-conditioning work on rooftop after date of accident, were admissible in negligence suit to impeach plaintiff's claim that he was unable to perform various tasks due to injuries).

Finally, the record does not bear out Plaintiff's assertion that any error in the exclusion of the Facebook photos was harmless because Defendants could cross-examine Plaintiff and Dr. Calodney about the extent of her physical injuries. The trial court's evidentiary ruling deprived Defendants of any meaningful opportunity to challenge Plaintiff's credibility. The photos could have (i) confirmed the initial hospital testing and other testing showing no injury after the accident, (ii) confirmed Dr. Calodney's own notes that up until two months before trial Plaintiff would not need surgery, (iii) raised a question in a reasonable juror's mind about whether the accident actually was the cause of the surgery, and (iv) caused the jury to view in a different light defense counsel's extensive questioning of Dr. Calodney regarding Plaintiff's many normal medical tests. (5 RR 133:4–147:25; 6 RR 7:11–41:7).

Moreover, the photos were not cumulative of other evidence. In this case the old adage "a picture is worth a thousand words" rings true. These photos were of quite a different character than cross-examination of Plaintiff and one of her experts. They show her crouching and holding up a buck's antlers. And a number

of inquiries could have been made based on the photos. Was Plaintiff hunting by herself? How did she get the buck or hogs to and in her truck? Who gutted the buck and hogs? Each of these tasks takes strength Plaintiff asserted she did not have.

## IV. THE EXPERT TESTIMONY DOES NOT SUPPORT THE JURY'S FINDINGS.

The Texas Supreme Court has consistently guarded expert testimony from those who attempt to circumvent the safeguards erected to protect the integrity of expert testimony. As recently as 2009 the court said, "If courts merely accept 'experience' as a substitute for proof that an expert's opinions are reliable and then only examine the testimony for analytical gaps in the expert's logic and opinions," an expert can effectively insulate his or her conclusions from meaningful review by filling gaps in the testimony with almost any type of data or subjective opinions. *See Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 639 (Tex. 2009) (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 722 (Tex. 1998)).

The testimony of Plaintiff's medical expert, Dr. Calodney, was scientific in that it was a medical opinion about whether one of two specific spinal surgeries should be performed. *See Gammill*, 972 S.W.2d at 721. Under *Daubert* and the Texas Supreme Court's interpretations of *Daubert*, the testimony could not be experience-based, like the testimony of an experienced car mechanic's diagnosis of problems with a car's performance. *Id.* at 722. To diagnose mechanical problems

with a car, an engineer and engineering principles are not necessarily needed. *Id.* But determining what type of spinal surgery is needed requires a scientific opinion based on training, skill, knowledge, and experience. *Id.* Dr. Calodney has none of these, and the case law supports a conclusion that he could not testify on what type of spinal surgery was needed.

For example, in *Cortez v. Tomas*, the court held that a doctor who trained in obstetrics and gynecology, taught in the field, performed research in the field, and published in the field was not qualified to opine if a surgeon properly removed a patient's ovary and if the postoperative care was appropriate. No. 02-11-00231-CV, 2012 Tex. App. LEXIS 1092, *9–15 (Tex. App.—Fort Worth Feb. 9, 2012, no pet.). Although the doctor was board certified in the area of practice, nothing in his CV "discloses or describes [the doctor's] training or experience performing, observing, or teaching other physicians about the *surgical removal of an ovary* and the patient's postoperative care." *Id.* at *15 (emphasis added).

Likewise, when confronted with conclusory assertions very similar to those of Dr. Calodney, the Houston Court of Appeals held that a doctor was not qualified as an expert. *See Ibrahim v. Gilbride*, No. 14-09-00938-CV, 2010 Tex. App. LEXIS 9710, *18–20 (Tex. App.—Houston [14th Dist.] Dec. 9, 2010, no pet.). That doctor said about his qualifications, "During the course of my more than forty (40) years as a medical doctor, I have diagnosed, treated and managed dozens of

patients who suffered from seizure disorders, and have been actively involved in the care of and treatment of this type of condition throughout my medical career."

*Id*. at *18.

The court of appeals had this to say about his qualifications.

> Notwithstanding any issues regarding the vague term "dozens" (whether it means twenty-four or more than 1,000 patients), Dr. Smith's statement that he has "diagnosed, treated and managed dozens of patients who suffered from seizure disorders" does not establish Dr. Smith has treated these patients *for* seizure disorders. This statement could just as well mean Dr. Smith managed the general healthcare of these patients or treated them for other conditions and they also suffered from seizure disorders.
>
> Moreover, Dr. Smith's statement in the remainder of the sentence—that he has "been actively involved in the care of and treatment of this type of condition throughout" his medical career—is vague and conclusory . . . . In essence, Dr. Smith merely tracks the language of the statutory criterion that he "actively practices in rendering medical care services relevant to the claim," without providing any facts to explain his experience. "Actively involved" could mean Dr. Smith has treated patients for seizure disorders. However, on the opposite end of the spectrum, "actively involved" could mean that, if a patient whose general healthcare was managed by Dr. Smith had a seizure disorder, Dr. Smith referred the patient to a specialist and merely stayed abreast of the patient's

24

progress and the medications prescribed, which would not necessarily render him qualified to opine on the standard of care for such a condition.

*Id.* at \*18–20.

Another case—where the court found that a doctor was qualified—also is helpful by providing contrast between his proof of qualifications and Dr. Calodney's proof. *See Tawa v. Gentry*, No. 01-12-00407-CV, 2013 Tex. App. LEXIS 4828 (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.). In *Tawa*, the question was whether the attending physician appropriately allowed his patient with atrial fibrillation and kidney issues to be taken off an anti-coagulant. *Id.* at \*2–3. The expert's report stated that he had experience treating patients diagnosed with atrial fibrillation, that he knew the "standard of care associated with the diagnosis and treatment of the illness and injury [the patient] suffered, including his atrial fibrillation, the need for anticoagulation, the risks of embolic stroke, and management of kidney disease." *Id.* at \*18. Finally, the doctor stated that he had "treated many patients with atrial fibrillation and uncontrolled hypertension," and that he has "knowledge of the risks involved when such patient's antithrombotic treatment is discontinued." *Id.*

These cases illustrate the flaws in Dr. Calodney's testimony. In spite of Dr. Calodney's bluster and theatrical annoyance that anyone might question his expertise—"So I'm not sure what sort of challenge you're going to put forth to me

saying that I can't testify about these things. Who are you going to find that's more qualified than me?" (5 RR 16: 10–17:19)—Plaintiff failed to establish that Dr. Calodney was qualified to testify about what type of surgery Plaintiff required and whether Plaintiff could ever work again. His answers to questions on his qualifications were at the same time grandiose and vague. (5 RR 117:1–13; 129:8–20) When asked specifically if he was qualified to perform the Plaintiff's surgery, he admitted he was not, but then said that he had "scrubbed in" on some number of spinal surgeries without specifying the number or type of surgery or his exact role in the surgeries. (5 RR 7:20–8:4, 13:2–23, 14:17–15:1, 16:10–18:17, 116:11–117:13) He then attempted to conscript the surgery center's accolades as his own in an effort to show that he must be qualified because he was a co-founder of the center. (5 RR 16:1– 9)

When boiled down to its essence, Dr. Calodney's testimony showed that he was not trained as a surgeon, has not written articles on the type of surgery someone with Plaintiff's injuries should have, and has not taught on the topic. (5 RR 16:10–17:19, 38:2–39:22, 50:7–22) In fact, Dr. Calodney testified that when he has exhausted all non-surgical options, *he refers his patients to spinal surgeons who then decide what surgery to perform.* Dr. Calodney does not perform the surgeries. His specialty deals with pain management pre- and post-surgery. (5 RR 37:14–38:10) Just how many of his patients had the exact symptoms as Plaintiff

the record does not show. Nor does the record show how many surgeries in which he "scrubbed in" were of the type he speculated Plaintiff would need. Dr. Calodney's testimony is a classic example of an expert's *ipse dixit.* He offered no scientific explanation for why a specific surgery would be required, nor could he, since he was not a trained surgeon. And his curriculum vitae, though lengthy, does not list any surgery experience.[2] (9 RR 84–114; DX 31)

Deficits also undermine Dr. Calodney's opinion on whether Plaintiff would be able to work again. To begin with, his vocational rehabilitation opinions are based on what type of surgery Plaintiff would have and his knowledge of the recovery from that type of surgery. (5 RR 50:5–51:3) If Dr. Calodney is not qualified to testify to what type of surgery Plaintiff would have, then his vocational rehabilitation testimony based on that opinion is unreliable.

Second, he testified that he is not a trained vocational rehabilitationist and that he did not perform a job site evaluation for Plaintiff. (4 RR 8:15–9:5) Instead, he testified that he has treated patients with ruptured discs "for years," though he did not say how many of these patients he had seen. (5 RR 11:13–12:14, 19:2–23) He did not say that the treatment of and recovery from a ruptured disc in all

---

[2] In some cases a medical expert who is testifying about the appropriateness of the defendant doctor's actions need not be a specialist in the defendant's particular area of practice if the subject matter of the claim is common to and equally recognized and developed in more than one field of practice, and the expert is qualified in one of those fields. *See Christus Health Se. Tex. v. Broussard*, 267 S.W.3d 531, 534–35 (Tex. App.—Beaumont 2008, no pet.). This record does not support the application of the doctrine.

sections of the spine are the same. Moreover, his opinion that Plaintiff could not work as a nurse and could secure at most wages at $11 an hour was based on Plaintiff having both disc and cervical issues. (6 RR 49:21–50:4, 51:4–16) Nowhere in the record does Dr. Calodney say that he has treated numerous patients with both disc and cervical issues; he says only that he has "seen it time and again over a period of 20 years." (6 RR 51:4–16) As the *Ibrahim* and *Cortez* courts pointed out, this does not mean that he treated these patients himself and is insufficient. *Ibrahim*, 2010 Tex. App. LEXIS 9710, at *18–20; *Cortez*, 2012 Tex. App. LEXIS 1092, at *15.

Even his testimony that the disc injury itself would prevent Plaintiff from working as a nurse is conclusory. He does not say how many patients he has treated with this injury, how many *nurses* he has treated with this injury, or if other nurses he has treated with this injury were unable to return to work. (5 RR 12:3–13:18) He testified that he has "done disability determinations for [his] patients who have spinal injuries" and that part of what he does is determine whether they can return to work, but again the testimony is very broad in scope rather than specific. (5 RR 19:2–23)

In *Gammill*, the Texas Supreme Court stated that courts must "ensur[e] that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Gammill*, 972 S.W.2d at 719 (quoting

28

*Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). In a later opinion, that Court explained that the *Robinson* factors apply even to testimony that is based more on experience. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800–04 (Tex. 2006). There the Court applied the six *Robinson* factors and found the expert lacking in qualifications and the testimony unreliable. The six factors are:

> 1. the extent to which the theory has been or can be tested;
>
> 2. the extent to which the theory relies upon the subjective interpretation of the expert;
>
> 3. whether the theory has been subjected to peer review or publication;
>
> 4. the theory's potential rate of error;
>
> 5. whether the underlying theory has been generally accepted as valid by the relevant scientific community; and
>
> 6. the non-judicial uses made of the theory.

*Id.* at 801.

Dr. Calodney's theory is that a person with Plaintiff's injuries will never work again as a nurse and that if she works, she will work only part time in clerical jobs. Setting aside the peer review requirement in factor 3 and the potential rate of error in factor 4, as the *Gammill* court noted could be done, *see Gammill,* 972 S.W.2d at 723, the remaining factors show that Dr. Calodney's testimony is not reliable.

29

Dr. Calodney's theory could be tested but has not been (factor 1). Dr. Calodney did not refer to any literature discussing this type of injury and the likelihood that a person could return to work as a nurse or as a part-time worker. Dr. Calodney's theory also is entirely subjective (factor 2). He cited no literature, did not give a sampling size from which he based his theory, and at one point even stated that *he* would not hire someone with Plaintiff's injuries to work in his office. (5 RR 12:15–13:5) The theory also has not been published—or if it has, Dr. Calodney did not refer to the literature (factor 3). If literature did exist on the topic, he could have presented it to the court. We also have no idea whether the vocational rehabilitation community agrees with Dr. Calodney's theory (factor 5). His CV does not refer to any training, seminars, or publications he has received in the area, nor did Dr. Calodney refer to any literature that would support his theory. (9 RR 84–114; DX 31) Finally, we have no information on the non-judicial uses of the testimony, in part because he refers to nothing other than his own opinion (factor 6).

In short, the *Robinson* factors confirm that Dr. Calodney's vocational rehabilitation testimony was unreliable. Although he testified that he was a designated doctor for worker's compensation evaluations, this testimony was non-specific; he never stated that he had evaluated numerous patients in Plaintiff's condition. (5 RR 19:2–23) *See Pediatrix Med. Serv. Inc. v. De La O*, 368 S.W.3d

30

34, 40 (Tex. App.—El Paso 2012, no pet.) (holding that doctor who was board certified in neonatology and pediatrics and was familiar with policies and procedures for ensuring screening for ROP was not qualified to testify regarding pediatric ophthalmology, ROP pathology, or the general effectiveness of ROP treatments because she did not have the experience, knowledge, training, or education in these areas); *see also* [*Tenet Hosp. Ltd. v. Love*](#), 347 S.W.3d 743, 748–750 (Tex. App.—El Paso 2011, no pet.) (holding that doctors' reports and CVs cited merely that doctors were specialists and had served on numerous hospital committees but did not show that doctors had experience in (1) setting hospital policies and procedures, (2) requiring hospitals to staff certain specialists under certain circumstances, or (3) running a hospital).

Dr. Calodney's testimony was used to support an award of lost wages of more than $1.4 million. In light of such a large award, his testimony should be carefully scrutinized with the *Robinson* factors; this scrutiny will reveal the many deficits in his testimony and show it to be mere *ipse dixit*.

With regard to Plaintiff's lost-wage expert, Defendants will stand on their original brief. Nothing in Plaintiff's brief raises any real question about the validity of Defendants' attacks on this expert.

## V. THE CATCH-ALL "STATUTORY EMPLOYEE" SPECTRE IS A RED HERRING.

Plaintiff claims that every error—other than the Facebook-photo and expert-

related error—is harmless based on her claim that Smith was Medallion's statutory employee. (App. Br. at 19–21 (the spoliation instruction), 27 (the negligence instructions), 44–45 (joint and several liability for Rushing))

Defendants have already addressed in their initial brief why Plaintiff should not be allowed to argue that Medallion and Rushing are vicariously liable when she refused such a stipulation at trial, presumably for tactical reasons. (Ant. Br. at 47–48, n.9) Beyond this, the argument also is flawed.

First, Plaintiff claims that Medallion and Rushing were vicariously liable for Smith, but the law is not as clear as Plaintiff claims in her two-paragraph superficial review of federal law and motor carriers. Plaintiff cites *Tamez v. Southwestern Motor Transport, Inc.* for the proposition that Medallion was vicariously liable for Smith, but then fails to note that in that case, the court found that the two drivers were **not** statutory employees of the carrier. 155 S.W.3d 564, 573 (Tex. App.—San Antonio 2004, no pet.). (App. Br. 20–21) More importantly, the *Tamez* court quoted language from the relevant federal regulations stating that an independent contractor relationship may still exist between a carrier and the lessor (Rushing) or the lessor's driver *when a carrier lease complies with 49 U.S.C. 14102 and attendant administrative requirements. Id.* (quoting 49 C.F.R. § 376.12(c)(1)) (emphasis added).

32

The record does not contain any indication whether or not Medallion complied with any attendant administrative requirements, although Medallion's and Rushing's lease agreement states quite clearly that Rushing and Smith are independent contractors. (8 RR 57 ¶ 9). At this point in the proceedings, it is impossible for Medallion to submit additional evidence to prove whether it did or did not comply with "attendant administrative requirements" that would authorize an independent contractor relationship. It would be improper to penalize Medallion for not introducing this evidence, when Plaintiff refused Defendants' stipulation that Smith was Medallion's employee and failed to obtain any finding from the jury on this issue.

Second, even if Smith was *Medallion's* statutory employee, all Defendants were harmed by the spoliation and negligence instructions, by the admission of spoliation evidence, and by the judge's refusal to allow impeachment questioning concerning the Facebook photos showing Plaintiff hunting. As a result of each of these rulings, *all* Defendants were painted as liars and deceivers while Plaintiff remained a saint.

Defendants' goal was to show that Plaintiff had some responsibility for the accident. After all, it was dark, she was going at least 50–55mph, she saw Smith's truck travelling at a very low speed in the lane next to her, she did not slow down. (3 RR 75; 7 RR 14–17) But the jury was not likely to believe that Plaintiff was

driving too fast based on testimony from an "incompetent" driver (or the claim of one who hired the incompetent driver) or from people who worked with a company that destroyed evidence.

Thus the harm to Defendants is not that the jury might assess different fault percentages to each *Defendant*—though that might happen; the harm is that the jury was too prejudiced by the improper rulings to consider whether *Plaintiff* was negligent, much less to assess any negligence on Plaintiff. Vicarious liability does not trump this harm, which probably caused the rendition of an improper judgment.

## CONCLUSION

Defendants ask this Court to reverse the trial court's judgment and to remand for a new trial for Smith and Medallion on all issues or, alternatively, to modify the judgment to (1) render judgment on certain damages awards that are not supported by the evidence and (2) provide that Medallion and Rushing are not jointly and severally liable. Appellants also ask the Court to enter a take-nothing judgment in favor of Tomy Rushing, whom the jury found was not negligent.

Respectfully submitted,

*/s/ Wanda McKee Fowler*
Thomas C. Wright
State Bar No. 22059400
Wanda McKee Fowler

34

State Bar No. 13698700
Shelley J. White
State Bar No. 24056520
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, Texas 77056
Tel: 713-572-4321
wright@wrightclose.com
fowler@wrightclose.com
white@wrightclose.com

G.R. (Randy) Akin
State Bar No. 00954900
G.R. RANDY AKIN, PC
3400 W. Marshall Avenue, Suite 300
Longview, Texas 75604
Tel: 903-297-8929
gra@randyakin.com

*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that, a true and correct copy of this document was served on all counsel of record in this case, identified below, on January 9, 2015, electronically through the electronic filing manager in compliance with the Texas Appellate Rules of Civil Procedure:

David M. Gunn
Erin H. Huber
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, TX 77010
dgunn@beckredden.com
ehuber@beckredden.com

John R. Mercy
MERCY CARTER TIDWELL LLP
1724 Galleria Oaks Drive
Texarkana, Texas 75503
jmercy@texarkanalawyers.com

Brent Goudarzi
Geoffrey G. Hoover
GOUDARZI & YOUNG
P.O. Box 910
Gilmer, Texas 75644
brent@goudarzi-young.com
ghoover@goudarzi-young.com

/s/ Wanda McKee Fowler
Wanda McKee Fowler

**CERTIFICATE OF COMPLIANCE**

I certify that this Brief as Appellant complies with the typeface and word-count requirements set forth in the Rules of Appellate Procedure. This Brief has been prepared, using Microsoft Word, in 14-point Iskoola Pota font for the text and 12-point Iskoola Pota font for any footnotes. This Brief contains 7,261 words, as determined by the word count feature of the word processing program used to prepare this document, excluding those portions of the notice exempted by TEX. R. APP. P. 9.4(i)(1).

/s/ Wanda McKee Fowler
Wanda McKee Fowler